[No. 26592.   *En Banc.*   September 16, 1937.]

THE STATE OF WASHINGTON, *Respondent,* v. JOSEPH
O'DONNELL *et al., Appellants.*[1]

[1] Reported in 71 P. (2d) 571.

*John F. Garvin, Roy Bullack,* and *Jacob Kalina,* for appellants.

*B. Gray Warner, John M. Schermer,* and *Harry A. Bowen,* for respondent.

GERAGHTY, J.—On the night of November 26, 1935, two police officers of the city of Seattle were shot to death in a tavern outside the north limits of the city. They had gone to the tavern in response to information that it was being burglarized. Subsequently, the appellants, together with Lester Rorick, were charged, by information in two counts, with the crime of murder in the first degree, in that, while in the commission of burglary, they fired the gun shots resulting in the death of the two officers.

Rorick pleaded guilty to the charge and testified as a witness for the state at the trial of the appellants. The jury returned verdicts finding the appellants guilty on both counts, as charged in the information. A special verdict recommended the death penalty for Joseph O'Donnell; no recommendation was made as to John O'Donnell. After the denial of motions in arrest of judgment and for new trials, the court entered judgments sentencing John O'Donnell to the state penitentiary for the term of his natural life and imposing the death penalty on Joseph O'Donnell, in accordance with the recommendations of the jury.

The evidence was sufficient to sustain the jury's verdict, and the judgment should be affirmed, unless, as contended by the appellants, prejudicial errors were committed by reason of which they were denied the fair and impartial trial guaranteed to them by law.

The first and controlling error assigned is gross misconduct of the prosecuting attorney in his opening statement to the jury. In the course of this statement, the prosecutor said:

"Incidentally, the evidence will show both of these men have records for burglary and robbery—prior records, and they have both served time in penitentiaries. . . . in view of the other testimony, in view of the other burglaries and the records that will show from the evidence, the state is going to ask you to hang these two men."

■ These remarks of the prosecuting attorney, made at the initial stage of the trial, were highly improper and, beyond question, prejudicial to the appellants, so much so that, whether guilty or innocent, they could not thereafter have had a fair trial.

"It may be that the defendant is guilty. On that we express no opinion. It must be remembered, however, that 'though unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained, is unjust and dangerous to the whole community'." *State v. Pryor*, 67 Wash. 216, 121 Pac. 56; citing *Hurd v. People*, 25 Mich. 404.

The prosecutor's remarks violated certain principles, basic in our system of criminal procedure. First, he placed the appellants' character in issue in advance of their taking the witness stand to testify in their own behalf; second, he asked the jury to hang the appellants not alone for the specific offenses with which they were charged, but "for the other burglaries and the records that will show from the evidence"; and third, by charging the appellants with the commission of collateral crimes, he placed them in a position where they had either to take the witness stand or rest under the imputation of those crimes; this being, in effect, a specie of compulsion to testify in violation of the immunity granted by the Federal and state constitutions. If the court had permitted the state to introduce evidence tending to show the commission by the appellants of other felonies, the error of the procedure

would not be questioned, nor would the court hesitate to grant a new trial.

While the prosecuting attorney was not testifying as a witness under oath, his statements were no less injurious to appellants. The office of prosecuting attorney is *quasi*-judicial. The incumbent is elected by the people to perform the highly responsible duties of the office in the belief that he possesses the high standard of character deemed necessary to the proper performance of his functions; his declarations to the jury are not taken lightly as the words of a mere advocate, but as having the prestige of authority. And so the law holds him to a high degree of fairness in presenting the state's case against persons charged with crime.

"The district attorney is a quasi judicial officer. He represents the commonwealth, and the commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers, as it is to see that no guilty man escapes. Hence, he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate." *Commonwealth v. Nicely,* 130 Pa. 261, 18 Atl. 737.

"He is an officer of the state, provided at the expense of the state for the purpose of seeing that the criminal laws of the state are honestly and impartially administered, unprejudiced by any motives of private gain, and holding a position analogous to that of the judge who presides at the trial. Such is the view taken of the office of the prosecuting attorney by the courts of this country as well as of England, and we think it is the true view of his position." *Biemel v. State,* 71 Wis. 444, 37 N. W. 244; and cited with approval in *State v. Montgomery,* 56 Wash. 443, 105 Pac. 1035, 134 Am. St. 1119.

The rule which excludes evidence of the bad character of the accused is grounded on the policy of avoiding the uncontrollable and undue prejudice, and possible unjust condemnation, which such evidence might induce.

Speaking of the rule that the defendant's bad character may not be offered against him, Wigmore says:

"This policy of the Anglo-American law is more or less due to the inborn sporting instinct of Anglo-Normandom— the instinct of giving the game fair play even at the expense of efficiency of procedure. This instinct asserts itself in other departments of our trial-law to much less advantage. But, as a pure question of policy, the doctrine is and can be supported as one better calculated than the opposite to lead to just verdicts. The deep tendency of human nature to punish, not because our victim is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury, in or out of Court. There are also indirect and more subtle disadvantages. Our rule, then, firmly and universally established in policy and tradition, is that the prosecution may not initially attack the defendant's character." 1 Wigmore on Evidence (2d ed.), § 57, p. 272.

This policy of the law is referred to in *State v. Devlin,* 145 Wash. 44, 258 Pac. 826, as follows:

"It is the law of the land, a right vouchsafed by the direct written law of the people of the state. It partakes of the character of fair play which pervades all the activities of the American people, whether in their sports, business, society, religion or the law. In the maintenance of government to the extent it is committed to the courts and lawyers in the administration of the criminal law, it is just as essential that one accused of crime shall have a fair trial as it is that he be tried at all, whether he be guilty or not, has his picture in the rogue's gallery or not."

Judge Peckham, in *People v. Shea,* 147 N. Y. 78, 41 N. E. 505, 511, says:

"Two antagonistic methods for the judicial investigation of crime and the conduct of criminal trials have existed for many years. One of these methods favors this kind of evidence in order that the tribunal which is engaged in the trial of the accused may have the benefit of the light to be derived from a record of his whole past life, his tendencies, his nature, his associates, his practices, and, in fine, all the facts which go to make up the life of a human being. This is the method which is pursued in France, and it is claimed that entire justice is more apt to be done where such course is pursued than where it is omitted. The common law of England, however, has adopted another and, so far as the party accused is concerned, a much more merciful doctrine. By that law the criminal is to be presumed innocent until his guilt is made to appear, beyond a reasonable doubt, to a jury of 12 men. In order to prove his guilt it is not permitted to show his former character or to prove his guilt of other crimes, merely for the purpose of raising a presumption that he who would commit them would be more apt to commit the crime in question."

Putting the characters of the accused in issue by charging them with the commission of crimes other than the one for which they were being tried, in effect, as we have before said, required them to take the witness stand or rest under the imputation of having committed the collateral crimes with which they were charged. This was doing what we condemned in principle in the case of *State v. Jackson,* 83 Wash. 514, 145 Pac. 470, where the prosecuting attorney, in the presence of the jury, made demand upon the defendant for the production of certain documents. Holding this to be reversible error, the court said:

" 'To permit a demand to be made on the defendant in a criminal case, in the presence of the jury, to produce a paper or document containing incriminating evidence against him, is a violation of the immunity secured to him by the fifth amendment to the Constitution of the United States, providing that no person

in any criminal case shall be compelled to be a witness against himself.' *McKnight v. United States,* 115 Fed. 972.

"The reasoning to sustain this principle lies in this: That the state is not put to the necessity, neither will it be permitted to put an inference of guilt which necessarily flows from an imputation that the accused person has suppressed or is withholding evidence, when the constitution provides that no person shall be compelled to give evidence against himself. Not being bound to produce evidence against himself, the demand is futile and can serve no purpose, except to put defendant in a false light before the jury and compel him to defend himself against the inferences arising from a collateral circumstance and to the stress of extricating himself from a position in which the constitution says he shall not be placed."

At the outset of its answering brief, the state confesses misconduct in the opening statement of the prosecuting attorney, but contends, first, that the remarks were not so flagrant or prejudicial as to work an injury on the appellants, since no more favorable verdict could have been rendered; second, that the remarks were justified under the rule what whatever is a proper argument after all the evidence is in is proper in the opening statement; and third, that a duty rested upon the appellants to protect themselves by making timely objections, moving the court for an instruction to the jury to disregard the remarks, or for mistrial.

We shall consider these contentions of the state in their inverse order.

Disposing of a contention similar to the last in *State v. Navone,* 186 Wash. 532, 58 P. (2d) 1208, we said:

"It is true that counsel for the defense might have then asked the court to instruct the jury to disregard the statements made, but, had that been done, it seems to us the virus could not have thus been removed. This question of character bears with peculiar force

upon the issue of intent, and the character of appellants having been destroyed with a single blow, the jury, as ordinary men and women, must necessarily have been greatly influenced thereby in determining the issue of intent. The ordinary direction to disregard could not restore the minds of the jurors to that fair and impartial state which the law requires."

In the recent case of *State v. Smith*, 189 Wash. 422, 65 P. (2d) 1075, answering a like suggestion made in exculpation of prejudicial and improper conduct on the part of the prosecuting attorney, the court said:

"The question was highly prejudicial and of such a nature that the prejudice largely consists in the mere asking of the question.

"The fact that the question was not objected to is not controlling. It may well be that an objection to such a question, even though sustained, is more damaging to a defendant's case than almost any answer could be. Neither, under the circumstances shown by this record, was a motion to strike the answer and instruct the jury to disregard the same necessary."

The state urges that the prosecutor's remarks were justified under a rule that whatever remarks are proper after all the evidence is in, are proper in the opening statement. We are not advised of any such rule. On the contrary, Rem. Rev. Stat., § 339 [P. C. § 8504], specifically inhibits anything in the nature of comment or argument in the opening statement.

Finally, considering the point made by the state, that however flagrantly the prosecutor's remarks may have violated the established rules of criminal procedure, the appellants could not have been prejudiced because they were proven to be guilty by evidence properly before the jury. This may be so, but the appellants are not alone involved here. The integrity of our system of administering criminal justice is also involved. The appellants are safely held in the King county prison without bail and may be tried

again without great inconvenience to the state, except in the matter of expense. This expense is but a small price to pay for maintenance of the standard of judicial fairness which is our boast. If, on the other hand, we condone the admittedly irregular procedure occurring in the trial,

" 'Twill be recorded for a precedent
And many an error, by the same example
Will rush into the state."

We are constrained to hold that the appellants must have a new trial.

With one exception, the other errors assigned are not likely to occur at a second trial and, therefore, call for no discussion. The exception is the admission in evidence of photographs of the bodies of the two slain officers. This assignment is disposed of adversely to appellants' contention in *State v. Gaines,* 144 Wash. 446, 258 Pac. 508.

The judgment is reversed and the cause remanded, with direction to grant the appellants a new trial.

MAIN, BLAKE, BEALS, and MILLARD, JJ., concur.

HOLCOMB, J. (dissenting)—In my opinion, there was no prejudicial error in the trial of this case by the remarks of the prosecutor in his opening statement to the jury, nor is it good legal logic to say:

"The appellants are safely held in the King county prison without bail and may be tried again without great inconvenience to the state, except in the matter of expense."

The majority also say:

"If, on the other hand, we condone the admittedly irregular procedure occurring in the trial, ' 'Twill be recorded for a precedent, And many an error, by the same example Will rush into the state'."

In this case, the prosecutor confessed error in the opening statement, as set out in the majority opinion, but it is also shown that competent counsel for appellants did not then or thereafter at any time during the trial object to those remarks, move to strike, or move the court to instruct the jury to disregard them. Neither did they move for a mistrial immediately after the close of the state's case. They should have requested a written instruction to the effect that the statements of counsel were not to be considered as evidence. Appellants did none of these things.

In this case, as was said by the dissenters in *State v. Navone,* 186 Wash. 532, 58 P. (2d) 1208, reversing the judgment on the ground of misconduct of counsel means that we disregard *State v. Vogel,* 183 Wash. 664, 49 P. (2d) 473; *State v. Stevens,* 135 Wash. 361, 237 Pac. 723; *State v. Ashe,* 182 Wash. 598, 48 P. (2d) 213; *State v. Spear,* 178 Wash. 57, 33 P. (2d) 905; and other cases.

Other cases include *State v. Pepoon,* 62 Wash. 635, 114 Pac. 449, a murder case where the opening statement of the prosecutor was a flagrant violation of the law; *State v. Mallahan,* 66 Wash. 21, 118 Pac. 898; *State v. Jewett,* 121 Wash. 620, 209 Pac. 1076; *State v. Larson,* 123 Wash. 21, 211 Pac. 885, where the remarks were much more prejudicial than in the present case; *State v. Crowder,* 132 Wash. 496, 231 Pac. 930; *State v. Groshong,* 141 Wash. 270, 251 Pac. 289; *State v. Jellovich,* 156 Wash. 388, 287 Pac. 3; and *State v. Navone,* 180 Wash. 121, 39 P. (2d) 384.

*State v. Jackson,* 83 Wash. 514, 145 Pac. 470, largely relied upon by the majority to sustain this decision, is inapposite. While a casual reading of the opinion might indicate that it was held reversible error for a prosecuting officer to make a demand upon a defendant in the presence of a jury for the production of a paper

or document containing incriminating evidence against him without more, a careful examination of the opinion shows that this was not its purpose or intent. The demand was not only made, *but it received the sanction of the trial court.* The defendant was put to the hazard of either producing the incriminating evidence or submitting to the inference of guilt arising from his refusal to produce it. *State v. Lindberg,* 125 Wash. 51, 215 Pac. 41.

Even *State v. Smith,* 189 Wash. 422, 65 P. (2d) 1075, which was exceedingly bad law, does not remove the necessity for an objection or request to have the objectionable remarks stricken, and, to again quote the majority opinion, "many an error, by the same example will rush into the state."

That case should be overruled at the first opportunity and will receive my dissent and protest as long as it is cited as authority, until it has become hopelessly established as *stare decisis.*

In this case, the trial judge carefully preserved every right of the accused when called upon to do so. It was an exceedingly atrocious crime, appellants were fairly convicted, and the judgment and sentences should stand.

ROBINSON, J. (dissenting) — The majority have reached the conclusion that it is the duty of this court to restore the legal presumption of innocence to a man who, in the lower court, confessed, before court and jury and all other persons present at the trial, that he committed the brutal murder with which he is charged. I can find nothing in the record, or in our rules of law or procedure, or in the majority opinion, that convinces me that it is my duty to participate in such an act. On the other hand, I find many things in the record which convince me that it is my duty to vigorously protest against it.

To grant a new trial in this case is not only to make the administration of criminal justice appear ridiculous, but it can only be done at the cost of departing from a rule which is well-settled and long-established, as may be seen by referring to the long line of decisions cited in the dissenting opinion of Judge Holcomb. I refer, of course, to the rule that a case will not be sent back by this court for new trial on account of alleged prejudicial comment of counsel unless a mistrial is demanded at the time, or the court requested to instruct the jury to disregard it, or, at least, some kind of a vigorous objection is made.

The rule is in no sense arbitrary or capricious. It is grounded upon sound reasons; one is that, if no protest was made at the time, it may justly be assumed that the comment was not, in fact, harmful. Another and more important reason is that, if appellate courts should grant new trials where no relief was asked, or exception taken, or objection made, in the court below, the practice would result in the prolongation of litigation and in the opening of avenues through which the administration of justice might readily be impeded, obstructed, delayed, and even wholly prevented.

In justification of their departure from the well-settled and long-established rule, the majority cite but two cases. They quote from the very recent case of *State v. Smith,* 189 Wash. 422, 65 P. (2d) 1075:

"The fact that the question was not objected to is not controlling. It may well be that an objection to such a question, even though sustained, is more damaging to a defendant's case than almost any answer could be. Neither, under the circumstances shown by this record, was a motion to strike the answer and instruct the jury to disregard the same necessary."

The quotation does not reveal the fact that, in that case, counsel preserved his record by securing a ruling

from the court in advance that the question was prejudicial and should not be asked. The question was put, however, in direct disobedience of the court's order, and counsel was entitled to assume that the court would deal appropriately with that matter in due course and upon its own motion. I cannot think that this case in any way justifies a departure from the long-established rule.

The other case cited as sustaining a departure from the rule is also a recent decision of this court. *State v. Navone,* 186 Wash. 532, 58 P. (2d) 1208. After setting forth in full the alleged prejudicial remarks of counsel, the court said:

"Misconduct is to be judged not so much by what was said or done as by the effect which is likely to flow therefrom. What would be misconduct in one case might very well be held not to be misconduct in another. Each situation involving the question of misconduct must stand by itself and must be considered in the light of all of its facts and circumstances to the end that verdicts properly arrived at shall not be disturbed, and that those verdicts which may have been induced by prejudice, or by something beyond the issues, shall not be allowed to stand."

Then, keeping in mind that every such case must be considered in the light of its own facts and circumstances, the court proceeded to analyze the facts and circumstances in the case before it, and, having done so, very properly held that a new trial should be granted, because (1) the case was "nicely balanced;" (2) "the state's case was none too strong at best;" (3) "the only issue before the jury was upon the question of intent, . . . a delicate subject;" (4) the objectionable remarks were made in the prosecutor's closing statement, and he therefore "had the last word;" and (5) "it would seem but fair and just to hold that counsel's repeated objections, three or four

times repeated, should be sufficient to enable us to rule upon the real question involved."

The *Navone* case is clearly not an authority which in any way justifies a departure from the accepted rule. In the first place, there were objections,—three or four times repeated. In this case, there was no objection at all. There, the case was nicely balanced, the state's case was none too strong at best, the only question before the jury of a highly technical nature, and the statement complained of was made in the prosecutor's closing argument. Not one of these facts or circumstances, or anything analogous to them, is present in the case at bar. Nevertheless, if, in complete disregard of all previous authority, we depart from the rule upon which the dissenting opinion of Judge Holcomb is based, we shall find the *Navone* case of the greatest possible value in solving the question then remaining, and this is so because it not only points out the correct method of approach to its solution, but also gives a concrete illustration of the proper application of that method.

If we depart from the rule, the question remaining in this case is: Did the error complained of affect the verdicts? This question, as the opinion in the *Navone* case points out, cannot be answered by the mere matching of precedents, nor can it, with all deference to the majority, be satisfactorily answered by assembling beautifully phrased quotations, more or less dissociated from the facts which provoked their expression. When that method is employed, sentiment is apt to obscure reality. In the very nature of things, the correct answer can only be arrived at by the method used in the *Navone* case, that is, by an inquiry into the facts and circumstances surrounding the case at bar.

Lester Rorick and the appellants, John James O'Donnell and Joseph R. O'Donnell, were charged in

one count of the information with having, on November 26, 1935, murdered Trent A. Sickles, a police officer, when interrupted by him while they were committing a burglary in a Seattle tavern, and, in the other count, with murdering officer Theodore E. Stevens at the same time and place and under the same circumstances. Rorick was granted a separate trial. The trial of appellants began on November 17, 1936. On November 25th, the jury found the appellants guilty on both counts, and, in the case of Joseph R. O'Donnell, directed that the death penalty should be inflicted.

The evidence on behalf of the state was, in substance, as follows: · On November 26, 1935, at about 4:30 a. m., Charles Maskell, who lives about two hundred feet from the Elk tavern, saw some lights flashing therein, and notified police headquarters. In about fifteen minutes, two officers arrived in a prowler car, looked about the building, and walked in. Several shots were fired. *"Three* men ran out of the tavern, two north and one south." About two minutes later, another prowler car arrived. Mrs. Maskell testified to the same effect, saying: "Two men ran north after the shooting and one south." F. V. Winkler, who lived directly across from the Elk tavern, testified that he heard several shots; that one man ran around the corner and "I saw two other men run north." A fourth witness, living in the neighborhood, saw one man run south, and testified that at least more than one escaped in another car which was parked within fifty feet of her house, for she heard them talking together as they started the car.

Within a few minutes after the three men ran away, two other police officers arrived at the tavern. They found Officer Stevens doubled up on the doorstep, with a bullet through his liver. He begged them to

look after Officer Sickles who, he said, was more severely hurt. They found Sickles dying just inside the door. A portion of his face had been blown away by a shotgun charge. Stevens died the next day. On the premises, the officers found a bolt cutter which had been used to cut the lock on the door, and some crowbars and an electric drill which had been used to drill the locks on the steel cabinets enclosing the slot machines. Some of these appliances were identified by owners from whose premises they had previously been stolen by breaking and entry.

The state called Rorick, John O'Donnell's brother-in-law. He testified, in substance, that he and the two appellants, on November 25th, planned to break into the Elk tavern and steal the slot machines, and he agreed to meet them at the tavern at one o'clock a. m. He overslept, but appellant Joseph R. O'Donnell called him by phone about two. He took his car and met the O'Donnells in their car near the Elk tavern. They thought it was too early to break in and went elsewhere to get something to eat. Later, the three men returned to the Elk tavern. Rorick identified the tools found on the premises. They were brought there by Joe O'Donnell in the secret compartment of his car. Joe O'Donnell carried the shotgun; Jack O'Donnell a .45 automatic. The witness had a .32 Mauser. At about four o'clock, they cut the lock on the door with the bolt cutter. The two O'Donnells went inside to drill the locks on the slot machine cabinets. Rorick went outside to serve as lookout. When he thought the O'Donnells were about through, he went in, and just then Jack O'Donnell said: "Here comes a car without lights." They heard someone back of the building. Then they came around to the front of the building. The three men hid in the booths. One officer came in the door and said: "It looks like they

are gone." Joe O'Donnell said: "Wait until both come inside." Joe O'Donnell yelled: "Stick them up," and the shooting began.

The witness did not know whether he shot an officer or not. Everything happened so fast. He ran out of the building carrying the Mauser in one hand and a .38 revolver, which he had picked up in the tavern, in the other. On his way, he was shot in the leg, presumably by the accidental discharge of one of his own guns. He dropped both of them. They were found by a milkman and produced at the trial. He got in his car and drove down 90th and met the O'Donnells in their car. The three of them went to the home of a man named Jurey, where Rorick's wound was dressed. He had participated, with Joe O'Donnell, in seven or eight previous slot machine raids, but Jack O'Donnell was present at only one of them.

Jurey testified that the O'Donnells rented his garage, stating that they were in the slot machine business and wanted it as a place to repair slot machines. He built the secret compartment in Joe O'Donnell's car. I quote a portion of his testimony, as abstracted by the appellants:

"Jack and Joe both worked on the slot machines. They came to my house on the morning of November 26th. Lester Rorick was with them and had been shot in the knee. They came about five in the morning. They said Lester had had an accident."

Josephine Pierce, a sister of Rorick and of John O'Donnell's wife, testified that Jurey phoned her to pick up Rorick's car. Not being able to find it, she sought the aid of Jack O'Donnell to show her where it was parked.

The foregoing is by no means a complete digest of the state's case, but it is, I think, a fair statement of its salient points. It is, at least, sufficient to show that

it cannot be said, as was said in the *Navone* case, "The state's case was none too strong at best."

The defense opened with an attempt to prove an alibi for Jack O'Donnell. His wife, who had been estranged from him, was called and testified that she happened to be at his house on the night of November 25th, and that he was there all night; that at five or five-thirty in the morning, Joe O'Donnell rapped on the window and called Jack O'Donnell out; that he dressed and went away with Joe. It is impossible to analyze her testimony here, but it is extremely unconvincing, and it is difficult to see how the jury could have given it any credit. There was another woman in the house at the time who was not called.

John O'Donnell then took the stand on his own behalf. On his examination in chief, he detailed the various crimes of which he had been convicted and for which he had served three terms in Walla Walla. He said that there was bad feeling between himself and Rorick. Rorick had been keeping bad company, and he had advised him to break away from his evil associates. He denied ever having had anything to do with his brother's and Rorick's slot machine activities and all evidence of any kind and character which tended to prove that he was at the Elk tavern on the morning of November 26th. He testified that he had been awakened by Joe's rapping on his window at about 5:30 that morning. He was told that Rorick had been accidentally shot. Joe asked him to park Rorick's car and accompany them to Jurey's house, all of which he did.

At the end of his testimony in chief, John O'Donnell's attorney moved for severance, and also for leave to withdraw from the case, stating that he had lost the confidence of his client. In the argument which followed, Joseph O'Donnell took part. In urging the court

to provide his brother with another attorney, he said: "My brother's life is at stake." Be it said to his credit that he seems to have been greatly concerned for his brother. He was also concerned for himself. I find in the appellants' abstract the following testimony by Ernest Yoris, chief of detectives, Seattle police department, given on cross-examination just before the close of the case:

"I have talked to him [Joseph O'Donnell] in this court since the trial opened. He asked me if they could both plead guilty and take life. I told them they would have to take it up with Mr. Magnuson."

Joseph O'Donnell was recalled on sur-rebuttal very shortly thereafter and testified that certain statements ascribed to him by Yoris were never made. He did not, however, include the above mentioned matter in his denials.

The motion for severance and for substitution of attorneys having been denied, Joseph O'Donnell was called as a witness. He testified that he and Rorick had been in the business of stealing slot machines, and that they stored them at Jurey's. That Rorick was to meet him at twelve o'clock on the night of November 25th to burglarize the Elk tavern. That Rorick did not turn up, and he called him by telephone at two a. m. That Rorick was already in the vicinity when he drove up to the tavern at 2:20. That they concluded it was too early and drove then out into the country. When they returned, they opened the secret compartment in his car, took out the drill, bolt cutter, and crowbar. Rorick carried the shotgun and the .32 Mauser. They cut the lock off the door and entered.

He began drilling one of the steel slot machine cabinets when Rorick came in and said there was a car coming without any lights. He ran to the back

door. Somebody tried it and said: "Come out of there." They knew then they could not get out the back and they returned to the front of the building. Rorick picked up a gun from the back bar and handed him the shotgun. They crouched in the booths. I here quote from appellants' abstract, which, upon comparison with the statement of facts, appears fair and accurate. Italics used here and elsewhere are mine.

"Two men came in. I did not know they were officers. One man stopped just opposite the booth I was in. One man had a shotgun or rifle in his hand. I said, 'Don't move, stick them up.' The man opposite turned and I realized that it was his life or mine, *I shot that man.* I did not want to hit him and tried to shoot over his head."

That, of course, constituted a confession of murder in open court. It may be noted at this point that an expert on gunshot wounds testified that the shotgun must have been held within two or three feet of Sickles' head. Both the autopsy surgeon and Captain Yoris testified that Sickles was shot from the back. His bloody uniform coat, with a portion of the collar blown away, is among the exhibits.

Joseph O'Donnell further testified that, when he and Rorick met again shortly after they had made their get-away, they went to Jack O'Donnell's home, awakened Jack, told him that Rorick had been accidentally hurt, and asked him to help take care of him. Jack O'Donnell objected, saying that he was not on speaking terms with Rorick, but finally went along.

With the exception of the details of a feeble and ineffective attempt to prove that Rorick was especially well-treated in the county jail, the foregoing is, I think, a fair picture of the defense.

Our rules governing procedure and the admission and rejection of evidence are so highly technical that it is almost impossible to conceive a record entirely

free from error in a case, either civil or criminal, which has been bitterly contested for five or six days, as this case was, no matter how skillful the attorneys engaged or how able the trial court. It is obvious, therefore, that cases cannot be reversed simply because errors have occurred, but only when those errors are harmful. If it were otherwise, litigation would be interminable. The experienced and able judge who presided over the trial of this case, and who was in a better position to determine whether or not the error was harmful than anyone else could possibly be, has held that it was not harmful by denying the motion for a new trial and entering judgment and sentence. I do not see any reason why his determination of the matter should not be accepted.

The statements of the prosecutor, which are complained of, were made at the very opening of the trial, and, in view of the fact that the minds of the jury were almost immediately fixed upon crimes in comparison with which burglary is trivial, and remained so fixed for five or six days, I cannot doubt but that they were almost, if not altogether, forgotten.

It is claimed that the prosecutor's statement forced the appellants to take the stand, thus giving the state an opportunity to go into their criminal records. In view of the case made out by the state, what else could the appellants have done other than take the stand; and, as to these other crimes which they themselves detailed without waiting for cross-examination, the court gave them the utmost possible protection. I find among the instructions the following:

"Neither should you determine the facts in this case because of other acts and things admitted by any defendant. Each defendant here is either guilty or not guilty by reason of his acts on the morning of November 26, 1935."

It is argued, however, that the prosecuting attorney's statement may have induced the jury to direct the death penalty in the case of Joseph O'Donnell. Again, I cannot believe or imagine that the prosecutor's statement was in the minds of the jury as they deliberated upon the fate of Joseph O'Donnell. They had before them in the jury room the blood-drenched and shot-torn tunic of Trent Sickles and six or seven large photographs of his body; horrible, gruesome, close-range photographs of his head, with the side of his face shot away. If, as the members of the jury examined those exhibits, there was any statement made at the trial ringing in their ears, it was not the comparatively mild statement of the prosecutor made a week before, but the statement of Joseph O'Donnell himself, made to them from the witness stand a few hours before: "I shot that man." In any event, why should it be thought or supposed that the members of the jury directed that Joseph O'Donnell should suffer the death penalty because the prosecuting attorney called him a burglar, when they had his own personal assurance that he was, in fact, a murderer?

It is rightly said in the majority opinion that the appellants are not alone involved here. When we have broken down our long-established rule, we may expect other counsel to remain silent when like errors are committed and speculate upon the outcome, secure in the fact that, if the case goes against their clients, they can invoke the precedent made in this case to secure a new trial and thus further put off the day of reckoning, or, perhaps, by some fortunate break, escape it altogether.

It is further said in the majority opinion that the appellants may be tried again without great inconvenience to the state, other than the expense of trial, and that this will be a small price to pay for the main-

tenance of the standard of judicial fairness "which, is our boast." The average citizen is likely to say that a system which restores the presumption of innocence to a defendant who has confessed his crime under oath in open court, and sends him back for a new trial, in which he may be, due to one mishap or another, declared wholly innocent, is nothing to boast about.

For that matter, I have not, of late, heard many boasts about the American system of criminal procedure. I have had the impression that it was generally agreed that we had fallen far, far behind the English system from which it was derived. I have very recently heard it said, by an expert in the matter, that, in comparison with the present English system, our system is positively mediaeval. I had supposed that it was generally agreed that this is one of the principal reasons why America is so much more grievously crime-ridden than England and the English dominions. If this is true, or only half true, or if it has in it only a modicum of truth, it is no time to take this backward step.

In my opinion, the judgments and sentences appealed from should be affirmed.

STEINERT, C. J., and TOLMAN, J., concur with ROBINSON, J.