[No. 31509. *En Banc.* June 23, 1960.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES E. ROSS, *Appellant*.[1]

[1]Reported in 353 P. (2d) 885.

*Gregory Nelson,* for appellant.

*James J. Solan* and *L. Edward Brown,* for respondent.

ROSELLINI, J.—On January 23, 1950, the defendant was charged by information in Grays Harbor county with the crime of murder in the first degree. He was found guilty by a jury and his motion for a new trial was denied. Thereafter he was sentenced to imprisonment in the state penitentiary. He gave notice of appeal and moved in *forma pauperis* for a free statement of facts; this motion was denied, the court stating that it had given very serious consideration to the defendant's motion for a new trial, had carefully reviewed the authorities, and was satisfied that he had had a fair trial. His appeal was thereafter dismissed by this court for failure to prosecute the same. A petition for a writ of certiorari, directed to the United States supreme court, was denied on June 4, 1951.

In 1957, he petitioned this court for a writ of *habeas corpus,* alleging that his constitutional rights had been violated when he was denied a free statement of facts. His application was denied in a *per curiam* opinion (51 Wn. (2d) 893, 318 P. (2d) 975); but the United States supreme court granted certiorari and remanded the case

for reconsideration in the light of *Eskridge v. Washington State Board of Prison Terms & Paroles,* 357 U. S. 214, 2 L. Ed. (2d) 1269, 78 S. Ct. 1061. By *per curiam* opinion (54 Wn. (2d) 916, 338 P. (2d) 343), we reinstated the defendant's appeal and permitted him to file a new motion for a statement of facts. The trial court granted the motion and appointed counsel to aid the defendant in prosecuting his appeal, which is now before the court on the merits.

The evidence discloses that at about noon on January 16, 1950, the defendant went to the apartment of a married woman named Reba Wiley, with whom he had been having an amorous adventure. According to her testimony, she told him she was finished with him; but according to his, she told him to stay away for a few days and let her make up her mind what she wanted to do. At that time, there was a hunting gun belonging to the Wileys lying on a table in the apartment. The defendant left the apartment, wandered about the town, purchased two or three pints of whisky and consumed them during the course of his travels from tavern to tavern, where he also drank beer. At some time during the afternoon, he returned to the Wiley apartment, to which he had a key, and took the gun. He was seen displaying this gun in several taverns. At about seven p. m., he returned to the Wiley apartment a second time (there was no one at home on either of these visits) and stood at the door at the foot of the stairs, which opened onto the street.

At this point Bob Johnson and Billy Roach, engaged in conversation with each other, walked past the entrance. The defendant made some remark, to the effect of "Is that so?" He was not acquainted with either of the men. They walked on past him, but when they had gone a few paces, Bob Johnson said, he was "going back to see what the man wanted." (Billy Roach testified that was after they had heard a shot fired, but other witnesses did not hear this shot.) Bob Johnson returned to the doorway, and told Roach that Ross had gone upstairs. A minute or two later, he said, "He is coming down now." The defendant then appeared in the doorway and a few words were ex-

changed between them. Most of their conversation was unintelligible to Roach, but he did hear Johnson ask the defendant what he had in his hand, "a .22 or an air pistol." Meanwhile, Roach was calling to him, "Come back, Bob." Johnson had his hands in his jacket pockets as this conversation took place. The defendant suddenly struck him in the face and then fired three or four shots. One bullet entered his heart and another entered his temple. Apparently, after he was down, he was shot in the back.

This scene was witnessed by two pedestrians in the street, as well as by the victim's companion. A few moments before, the proprietor of an adjoining tavern had walked past the scene and had been told by the defendant to keep moving.

After the shooting, the defendant revisited one or more taverns where he told people that he had just shot a man. He went into a grocery store where he told an acquaintance that he had just shot a man and might kill one or two more, naming Bob Wiley and Burt Foreman, a policeman. (He had previously threatened the life of Bob Wiley because he was standing between him and the woman he loved.) He was captured shortly thereafter and went quietly with the officers to the station, where he made a statement that he did not remember shooting Johnson, did not know him, and had had no trouble with him.

■ The first assignment of error charges misconduct on the part of the prosecuting attorney in his opening statement in referring to a statement which the defendant had made to the effect that on one occasion, all that saved Bob Wiley was the fact that he (the defendant) was on parole and there was a police vehicle parked in front of his house. In support of this assignment, the defendant cites *State v. O'Donnell*, 191 Wash. 511, 71 P. (2d) 571, wherein this court held that the defendants had been denied a fair trial because of the following opening remarks of the prosecutor:

" 'Incidentally, the evidence will show both of these men have records for burglary and robbery—prior records, and they have both served time in penitentiaries. . . . in view of the other testimony, in view of the other burglaries

and the records that will show from the evidence, the state is going to ask you to hang these two men.' "

This court held that the inflammatory effect of this statement was so great that an instruction to disregard it would not have cured the error in permitting it, and granted a new trial. The statement was found objectionable in that it placed the defendants' characters in issue in advance of their taking the stand; asked the jury to convict them not only of the crime charged, but of other and unrelated offenses; and compelled them to take the stand and testify, or rest under the imputation of the other crimes charged.

The prosecutor's statement in that case did not relate to anything which it was competent for him to prove in the state's case in chief. Here, it was the prosecution's theory that the defendant had shot Bob Johnson, mistaking him for Bob Wiley, and thus his threats against the life of Bob Wiley were relevant and admissible to show that he had formed the intent to take his life. The defendant's own explanation of why those threats were not carried out was also competent evidence. Testimony of several witnesses in regard to the defendant's parole was admitted without objection; and the prosecutor's first reference to it in his opening statement was passed without objection. Only once did counsel interpose an objection, and no grounds for the objection were stated. For all of these reasons, we cannot say that the defendant was denied a fair trial because of the prosecutor's opening statements.

■ The defendant says that references to his parole were likely to create in the minds of the jury the impression that he had been convicted of other felonies; but there is no merit in this, for the evidence, including his own testimony, showed that he was imprisoned by the army as a result of a court-martial for insubordination and similar offenses against the military.

■ A similar objection is made to references in the prosecutor's opening statement and in the testimony regarding the relationship which existed between the defendant and Reba Wiley. From the testimony as well as from the prosecutor's statement, an inference could be drawn, but

only an inference, that an illicit relationship probably existed between them. Under the state's theory, the evidence of this relationship was competent to show a possible motive for the killing and the state of mind of the defendant at the time. Motive and prior conduct of a defendant is as much a part of the substantive evidence to show premeditation as is the immediate reflective deliberation which precedes the act itself. *State v. Horner,* 21 Wn. (2d) 278, 150 P. (2d) 690.

Furthermore, no objection of any kind was made to the prosecutor's statements or to the testimony in this regard. The defendant himself testified that he loved Reba Wiley and had a close relationship with her until the day of the shooting. The admission, without objection, of other evidence on this matter was not reversible error.

■ Error is alleged in permitting evidence of threats directed against Bob Wiley—the objection being that they were not directed against the victim. The statute (RCW 9.48.030(1)) makes it a crime to kill a human being with a premeditated design to effect the death of the victim "or of another." As we pointed out above, the prosecution proceeded on a theory that the killing was the result of mistaken identity, and it was competent to prove threats against the person with whom the defendant could well have confused the victim (because of the defendant's inebriated condition, the twilight hour, the fact that both the victim and the supposedly-intended victim had the same first name and the victim's friend was calling him by that name at the moment of the shooting).

Counsel cite no case in point on this issue, and our independent research has revealed but one decision which dealt with the precise question before us. That is the case of *Clarke v. State* (1885), 78 Ala. 474. We quote from that case:

"3. A consideration of the theory of the case, as contended and attempted to be proved by the prosecution, is necessary to a proper determination of the relevancy and competency of much of the evidence to which objection is made. There is an absence of proof showing any malice or ill-feeling on

the part of defendant towards the deceased. It does not appear there had been any previous acquaintance between them. The theory of the State is, that the accused shot the deceased, mistaking him for Allen, whom he intended to kill. If this theory be found true by the jury, the defendant is guilty or innocent of the offense charged, the same as if the fatal shot had killed the person for whom it was designed.—*Tidwell v. The State*, 70 Ala. 33.

"4. Previous threats of the defendant against the person slain are admissible, as evincing malice, a criminal intent, and a motive to commit the deed. While not by themselves convincing, they are properly submitted to the jury, in connection with the other circumstances of the case, on the question of guilt or innocence.—*Redd v. The State*, 68 Ala. 492; *Winslow v. The State*, 76 Ala. 42. The record discloses evidence, which, if believed, proves that the accused, at the time of the shooting, mistook the deceased for Allen. While the general rule is, that a threat to kill some person, other than the deceased, does not prove or tend to prove the offense charged; yet, in a case of mistaken identity, evidence evincing malice, criminal intent, and a motive to kill the person really intended, is admissible, on the same principles, and for the same reasons, as if such person had been killed under the same circumstances. The credibility and sufficiency of the evidence to establish mistaken identity, as to which we intimate no opinion, is a question exclusively for the jury; who should receive instructions to give no weight or consideration to the threats, unless satisfied that the defendant shot under the belief that the deceased was Allen."

We approve the principles stated in the Alabama case, and hold that the evidence of threats toward another allegedly-intended victim was admissible.

■ Finally, the defendant challenges the sufficiency of the evidence to support a finding of premeditation. He bases this challenge on the fact that it was rather conclusively shown that he did not know the victim and had spoken with him only a few minutes when the shooting occurred. If the prosecution succeeded in convincing the jury that the shooting was the result of mistaken identity, there was ample evidence of premeditation to support it. If, on the other hand, the jury found that the defendant was not confused about the identity of his victim, it could

nevertheless find that his condition was such that he was able to form an intent and to reflect upon it, and this is all the time that is required to evidence premeditation. While it is true that an open knife was found near the dead man's hand, as he lay in the snow, no witness saw him attempt to use it, and the defendant did not claim that he acted in self-defense.

It is necessary for an appreciable period of time to elapse for premeditation to exist. *State v. Horner,* 21 Wn. (2d) 278, 150 P. (2d) 690. Whether it existed in this case was a question for the jury.

Like the trial judge, we have studied the record carefully, have given full consideration to the appellant's contentions, and are convinced that he was accorded a fair trial.

The judgment is affirmed.

ALL CONCUR.

