[No. 16794-4-I.   Division One.   August 31, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. PHU V. HUYNH, *Appellant.*

*Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant.

*David S. McEachran, Prosecuting Attorney,* for respondent.

GROSSE, J.—Appellant appeals a judgment and sentence finding him guilty of two counts of aggravated first degree murder, four counts of attempted murder, and one count of first degree arson, all arising out of an arson fire.

Appellant, his woman friend Hoang Tran, and her children lived together in Tran's house in Bellingham. After a time, they became estranged and appellant moved into his own apartment. In the early hours of January 12, 1984, Tran's house burned. Two of her children perished; Tran and three other persons suffered burns. At the fire scene, Tran accused appellant of starting the fire because their relationship had become tumultuous and appellant had threatened Tran and beaten her on several occasions. That same morning, Tran's Mustang automobile was found vandalized at a friend's residence where it had been left for repairs the day before. The car had been sold to Tran by appellant. The cause of the fire was investigated; analysis revealed that gasoline was the accelerant.

Pretrial motions were made to exclude the testimony of the State's expert criminalist and the evidence regarding the vandalism of the Mustang. The trial court ruled to admit both, but attached conditions to the conclusions to which the expert could testify. Additionally, at trial, over objections by the defense, the trial court admitted statements made by appellant to a police officer through an interpreter. These rulings are the subject of this appeal.

## EXPERT TESTIMONY

Appellant contends that the conclusion of the State's expert that gas recovered from the fire "matched" gas from

a 2–gallon can found in his car should have been excluded because the comparison technique used by the expert is not generally accepted in the scientific community. After a pretrial hearing on the admissibility of the expert's testimony, the trial court ruled to admit the testimony but refused to allow the expert to conclude that gasoline recovered from the fire probably came from the 2–gallon can found in appellant's car. The trial court limited the expert's conclusion to one that the gas recovered from the fire *might have been* from the 2–gallon can. At trial, the expert opined that the gas recovered from the fire *could have* come from the 2–gallon can. The issue presented is whether or not the expert's testimony was properly admitted.[1]

The *Frye* standard is the test to be applied to determine the admissibility of scientific evidence at trial. *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). That standard is "whether the scientific principle from which deductions are made is sufficiently established to have gained general acceptance in the scientific community." *State v. Canaday,* 90 Wn.2d 808, 812, 585 P.2d 1185 (1978).

> The rationale of the *Frye* standard is that expert testimony may be permitted to reach a trier of fact only when the reliability of the underlying scientific principles has been accepted by the scientific community. . . . the reliability of scientific evidence must be shown as a prerequisite to its admission.

(Citations omitted.) *Canaday,* at 813.

The reliability of evidence derived from scientific methods depends upon three factors: "(1) the validity of the underlying principle, (2) the validity of the technique applying that principle, and (3) the proper application of

---

[1]The admissibility of expert testimony lies within the sound discretion of the trial court and the ruling will not be overturned absent an abuse of discretion. *State v. Fagundes,* 26 Wn. App. 477, 614 P.2d 198, *review denied,* 94 Wn.2d 1014 (1980); *Crowe v. Prinzing,* 77 Wn.2d 895, 468 P.2d 450 (1970). In the case at bar, although it is not the basis for our decision, we must note that the trial court erroneously limited the expert's opinion to a conclusion which amounted to speculation. Such a speculative opinion is inadmissible. *See* 5A K. Tegland, Wash. Prac., *Evidence* § 297 (2d ed. 1982).

the technique on a particular occasion." (Footnotes omitted.) Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later,* 80 Colum. L. Rev. 1197, 1201 (1980). The first two factors are critical with regard to the admissibility of evidence derived from a novel scientific technique.

Application of the *Frye* standard to the evaluation of a new technique has created confusion.[2] Contributing to this confusion is the effect of the Rules of Evidence, specifically ER 401–403 and ER 702. Under ER 401 and 403, admissibility depends upon (1) the probative value of the evidence, (2) the potential of the evidence to mislead the jury, and (3) balancing the probative value of the evidence against the dangers of admitting it. "The probative value of scientific evidence, however, is connected inextricably to its reliability; if the technique is not reliable, evidence derived from the technique is not relevant." (Footnotes omitted.) 80 Colum. L. Rev. at 1235. ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under ER 702, three threshold requirements must be met before expert testimony is admissible: (1) the witness must qualify as an expert; (2) the opinion must be based upon an explanatory theory generally accepted in the relevant scientific community; and (3) the expert testimony is determined to be helpful to the trier of fact. *State v. Allery,* 101 Wn.2d 591, 682 P.2d 312 (1984); *State v. Black,* 46 Wn. App. 259, 730 P.2d 698 (1986).

---

[2]This confusion is in part due to the fact that many courts focus on the qualifications of the experts to the exclusion of determining what proof is necessary to validate the theory or technique. Critical problems frequently overlooked by courts in comparison techniques are the statistical validity of the sample population used and the statistical probabilities and relevance of the test results. *See* Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later,* 80 Colum. L. Rev. 1197 (1980).

■ While ER 702 does not specifically require the court to consider the reliability of the scientific procedure, reliability is a prerequisite for admissibility under the *Frye* standard. This discrepancy between ER 702 and the *Frye* standard was discussed in *State v. Maule,* 35 Wn. App. 287, 667 P.2d 96 (1983). *Maule* "fit" the *Frye* standard into ER 702 by placing the reliability of the method or technique within the framework of the threshold requirement that the testimony help the trier of fact. Evidence which is unreliable has little or no probative value and is not helpful to the trier of fact and, therefore, is inadmissible. *Maule,* at 294–95.

The State's expert used a novel methodology of gas chromatography[3] to compare samples of accelerant from the fire scene to gasoline from a 2–gallon can found in appellant's car, gasoline from appellant's car, gasoline from the Mustang, and gasoline from three gas stations located near appellant's apartment, in an attempt to determine the source of the accelerant. It is not disputed that gas chromatography is generally accepted in the scientific community as a method with which to determine the *type* of accelerant used in a fire. In fact the experts agree that gas chromatography is acceptable to compare unaltered—not weathered or burned—liquid gas samples for the purpose of determining the source. Where the experts part company is whether the technique is acceptable to compare an altered—weathered or burned—sample to an unaltered

---

[3]Gas chromatography is a scientific technique designed to separate and quantitate volatile materials in a heated column. A small volume of a liquid mixture consisting of a known solvent and the sample substance is injected into the machine and is carried into the heated column by an inert gas. The liquid mixture vaporizes and separates into its various components which are carried to a detector. The detector senses the components as they emerge from the column and records them as peaks on a graph. The peaks are proportional in size to the quantity of the component in the mixture. The distance from the solvent peak to the different component peaks designates the retention time. For a given column retention time of a substance is constant, as long as all conditions (temperature and flow rate) are unchanged. A comparison involves matching peak heights and retention times. A. Kaplan & L. Szabo, *Clinical Chemistry: Interpretation and Techniques* (1979).

sample in order to determine whether they have a common source.

The expert for the State described experiments he had personally conducted—one study compared gasolines from 10 different gas stations, a later study compared gasoline from one distributor dispensed to 10 different gas stations. According to the expert he was able to compare and match the samples even when pulled blind from his pool of sources. However, this study has not yet been published and no other case studies duplicating the results have been written or published.

The comparison of gasolines to determine the source of the accelerant in this case is fraught with problems. Defense experts pointed out that in comparison studies for the purpose mentioned above the source and sample populations are critical variables. These variables determine the statistical validity and relevance of the results of a comparison because they are supposed to represent the entire population of the sources. In the case at bar, the defense experts questioned the validity and relevance of the results of the expert's comparison because the source samples were few and not randomly chosen and there was no evidence that they were representative of the source population.[4]

The validity of the comparison was inferentially questioned by the State's own expert's testimony. While the

---

[4]It is important to note, as the defense experts pointed out, that out of all the gas stations in Whatcom County or the City of Bellingham, only three stations located near appellant's apartment were sampled. Thus, the source population for the State's expert's comparison consisted solely of six samples—two from vehicles, one from the 2–gallon can, and three from gas stations.

The defense experts agreed that in a very limited source population, comparisons and source identification may be possible. For example, the source of a gas leak may be identified where the sample was unaltered and there were only three possible gas station sources.

It is also true that gas chromatography is an accepted method of matching oil samples. However, the courts admitting the testimony comparing oil samples recognized the stable nature of oil and that the gas chromatography methods used employed dual detectors to enhance the reliability. *United States v. Distler,* 671 F.2d 954 (6th Cir. 1981); *United States v. Slade, Inc.,* 447 F. Supp. 638 (E.D. Tex. 1978).

expert was describing his experiments which compared unaltered gasolines, he acknowledged the volatility of gasoline when he explained how much the composition of gasoline varies from station to station and even within batches from the same distributor. The question raised by the defense experts and unanswered by the State's evidence was, if composition of gasoline is so unstable how can one get valid comparisons let alone determine the commonality of the source?

Finally, we note the glaring lack of corroborative testing using the expert's technique to compare unaltered gasoline to burned or altered gasoline. Of the journals and articles submitted, only one article discussed gasoline comparisons using a gas chromatography technique similar to that used by the State's expert and that article was an undated Union Oil Company publication.

In summary, we find that the State's technique of comparing unaltered gasoline to burned gasoline is not generally accepted in any scientific community and its reliability and therefore relevance is questionable. The admission of the expert's testimony that the source of the accelerant *could* be the 2–gallon gas can was error. Although the admission of the expert's testimony was error, it was not of constitutional magnitude and, accordingly, we apply the rule that the error is not prejudicial unless, within reasonable probability, we can say that it materially affected the outcome of the trial. *State v. Robtoy,* 98 Wn.2d 30, 653 P.2d 284 (1982). Because the remaining evidence was entirely circumstantial and not overwhelming, we find that the expert's testimony was critical and, more probably than not, affected the outcome of this trial.

### VANDALISM OF THE MUSTANG

Next, appellant contends that the State's evidence connecting him to the vandalism was insufficient and that the admission of that evidence was error. The State presented the evidence of the vandalism of the Mustang for the purpose of showing motive and appellant's enraged state of

mind.

To prove that appellant vandalized the car the State presented circumstantial evidence of: (1) a thumbprint identified as appellant's which was found on the inside of the Mustang's gas filler door; (2) human, but unidentifiable smudges on the outside of the gas filler door; (3) a fingerprint expert's opinion that the location of the smudges and the the thumbprint was consistent with a right hand opening the gas filler door, implying that the print and smudges were placed on the door contemporaneously; (4) testimony by the expert regarding the weather and road conditions on the day preceding the fire when the vandalism occurred, implying that the smudges were fresh; (5) testimony and exhibits indicating that raw sugar (the brand was not identified) had been poured in the gas tank; (6) testimony that raw sugar was sold at a market where appellant had shopped on occasion located one–half block from appellant's apartment, plus a picture of *a* brand which was on sale at the market; (7) testimony that appellant had been to Tran's friend's house on one or two occasions with Tran indicating he was familiar with the location where the Mustang was found vandalized.

Appellant rebutted this evidence by his own testimony in which he denied vandalizing the Mustang, accounted for his whereabouts on the evening in question, and explained that his thumbprint was found on the car because he had previously owned the car and, after selling it to Tran, he occasionally repaired minor problems, although he had not put gas in the car for at least 1 month. Also, no raw sugar was found in appellant's apartment. Defense experts countered that it was scientifically impossible to age the thumbprint or the smudges found on the gas filler door, and that fingerprints can last for a long time, up to several months even in adverse conditions. The issue presented, then, is whether the evidence of the vandalism was properly admitted.

Appellant was charged with aggravated first degree murder which includes the element of "premeditated intent

to cause the death of another person". RCW 9A.32-.030(1)(a). "Motive and prior conduct of [the] defendant is . . . part of the substantive evidence to show premeditation . . ." *State v. Ross,* 56 Wn.2d 344, 349, 353 P.2d 885 (1960). Further, evidence of the commission of a collateral criminal act is admissible to show motive or intent, *State v. Hink,* 6 Wn. App. 374, 492 P.2d 1053 (1972), if the proof indicates that the crime is connected to the defendant. *State v. Robtoy, supra.* Circumstantial evidence may be used to show the connection between the defendant and the collateral crime. Circumstantial evidence is proof of certain facts and circumstances, from which other connected facts reasonably may be inferred. *DeYoung v. Campbell,* 51 Wn.2d 11, 315 P.2d 629 (1957). However,

> [b]efore evidence of prior crimes, wrongs or acts can be admitted, two distinct criteria must be met. First, the evidence must be shown to be logically relevant to a material issue before the jury. We have previously expressed the test as "whether the evidence . . . is relevant and necessary to prove an essential ingredient of the crime charged." Second, if the evidence is relevant its probative value must be shown to outweigh its potential for prejudice. The trial court must exercise its discretion in weighing the probative value of the evidence against its prejudicial effect, and that decision will be disturbed only if the court abused its discretion.

(Citations omitted.) *Robtoy,* at 42.

Admittedly this is a close question. The strongest evidence linking appellant to the vandalism is the thumbprint on the inside of the gas filler door whereas inferences from the remainder of the evidence are equivocal. However, after careful review of the record, we cannot say that the trial court manifestly abused its discretion by admitting the evidence. There was no error.

Because this case will likely be retried upon remand to the trial court, it is necessary to address the remaining evidentiary issue.

STATEMENTS MADE THROUGH THE INTERPRETER

At a CrR 3.5 and suppression hearing, appellant made

three challenges: (1) his statements made to Officer Ziebell through an interpreter were obtained in violation of *Miranda*; (2) his statements to Officer Couture were obtained in violation of *Miranda*; and (3) his consent to search his car was not voluntary. The trial court found appellant's statements to Officers Ziebell and Couture admissible and his consent voluntary thereby making the 2–gallon gas can found in the trunk of his car and results from tests of the gas admissible. With respect to the statements made to Officer Ziebell, the trial court found that although the *Miranda* warnings were defective, appellant had not been subjected to a custodial interrogation and *Miranda* warnings were not necessary. With respect to the statements made to Officer Couture, the trial court found that the constitutional requirements of *Miranda* were satisfied because Officer Couture carefully informed appellant of his rights and explained them thoroughly in Vietnamese prior to obtaining appellant's statement. The preliminary issue is whether the trial court's findings of fact are supported by substantial evidence and, in turn, support the conclusions of law.

In the case at bar, Officer Ziebell testified that when he drove to appellant's home to question him, he did not intend to arrest appellant and, in fact, did not arrest appellant. With respect to statements made to Officer Ziebell, *Miranda* warnings would be required as soon as appellant was "in custody," that is, when his "freedom of action [was] curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty,* 468 U.S. 420, 440, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983)); *State v. Harris,* 106 Wn.2d 784, 789–90, 725 P.2d 975 (1986), *cert. denied,* 107 S. Ct. 1592 (1987). On the other hand, a routine investigative encounter supported by reasonable suspicion would not require *Miranda* warnings. *State v. Hilliard,* 89 Wn.2d 430, 573 P.2d 22 (1977); *State v. Mercer,* 45 Wn. App. 769, 727 P.2d 676 (1986). Appellant was questioned as part of a routine investigation of the

arson. *Miranda* warnings were not required because his freedom of action was not curtailed to a degree associated with formal arrest—he would not have been arrested had he refused to talk to the officer.

At the CrR 3.5 hearing, Officer Couture testified he assisted in appellant's arrest and that he conversed in Vietnamese with appellant and explained to him why he was under arrest. At the police station Officer Couture advised appellant of his rights and explained them to him in Vietnamese, which appellant indicated he understood. The officer obtained an oral statement from him which was later reduced to writing. Appellant testified that, although he signed the waiver card, he did not fully understand it. While the testimony is in dispute, there is substantial evidence showing that constitutional requirements were satisfied.

Finally, it is important to note that the validity of the search by Officer Ziebell is an issue separate and apart from whether appellant's statements to Officer Ziebell were obtained in violation of *Miranda*. The interpreter told appellant that the police officer wanted to search his car, but that appellant did not have to let him if he did not want to. Appellant said "okay". Further, the fact that appellant was not in custody speaks to and supports the voluntariness of appellant's consent. We conclude that appellant's consent to search was voluntary and not the product of coercion. Substantial evidence supports the trial court's findings and conclusions. Neither the statements made to the officers nor appellant's consent to search his car was obtained in violation of his constitutional rights.

The next issue is whether appellant's statements made to Officer Ziebell through an interpreter were properly admitted at trial.[5] In the case at bar, appellant spoke

---

[5]Generally, evidentiary rulings are within the sound discretion of the court. "To reverse we must find that the trial court's exercise of discretion was manifestly unreasonable or exercised on untenable grounds, or for untenable reasons." *State v. Knapstad*, 41 Wn. App. 781, 783, 706 P.2d 238 (1985).

only Vietnamese. During the arson investigation, Officer Ziebell went to appellant's home to question him, accompanied by Tran's niece who translated appellant's answers to the officer. At trial, the officer testified to the content of appellant's answers. Defense counsel objected to the admission of these translated statements on the basis of hearsay.

*State v. Lopez,* 29 Wn. App. 836, 631 P.2d 420 (1981) is controlling. In *Lopez,* a friend of the victim translated the victim's description of the assailant who had attacked and robbed him to a police officer. The police officer testified at trial to the victim's description of the assailant which matched the defendant. Neither the victim nor the translator was present at the trial for cross examination. The court in *Lopez* held that the description was inadmissible hearsay and reasoned that

> a witness is incompetent to testify to extrajudicial statements made by another person when it is necessary to have the statement translated before it can be understood by the witness. Such testimony is clearly hearsay because the witness testifies to what the interpreter asserts the other party said.

(Citations omitted.) *Lopez,* at 839. That is, the testimony "is based upon the translation alone rather than an understanding of the declarant's own words". Note, *Criminal Law/Evidence—Admissibility of Third–Party Testimony on Out–of–Court Statements Made to a Witness Through an Interpreter—Chao v. State, 478 So. 2d 30 (Fla. 1985),* 14 Fla. St. U. L. Rev. 372 (1986). The testimony is admissible only if it is not offered for the truth of the matters asserted or the interpreter is an agent or authorized to speak for the declarant. 29 Am. Jur. 2d *Evidence* § 501, at 558 (1967).

After review of the record, it is clear that the interpreter was not an agent for appellant and that the translation of appellant's statements was offered for the truth of their content. The proffered testimony by Officer Ziebell was clearly hearsay and not admissible under ER 801 or any exception to the hearsay rule. Moreover the trustworthiness

of the interpretation is questionable as the interpreter was related to a victim of the crime. The testimony should have been excluded.

In sum, this case is reversed and remanded for a new trial excluding the scientific evidence of the gas comparisons and the hearsay statements.[6]

RINGOLD, A.C.J., and WEBSTER, J., concur.

Review denied by Supreme Court January 5, 1988.

---

[6]Appellant concedes that his challenge to the propriety of his being charged with aggravated first degree murder is controlled by *State v. Carey,* 42 Wn. App. 840, 714 P.2d 708 (1986), which was decided adversely to his contention.