IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32564-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL RAY ARTEAGA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Seven months after 34-year-old Kimberly Schmidt was found

dead with a gunshot wound to the head from a handgun found at her side, the State

charged Daniel Arteaga with first degree murder. Mr. Arteaga, who had no criminal

history, had been involved in a six-and-a-half-year affair with Ms. Schmidt. It was

undisputed that Ms. Schmidt told Mr. Arteaga about six weeks before her death that she

had rekindled the relationship with the father of her 12-year-old daughter and, in the

future, wanted to be friends, only, with Mr. Arteaga.

There was evidence that Ms. Schmidt and Mr. Arteaga remained friendly

thereafter. The State's theory as to his motive for murdering Ms. Schmidt was that

despite his friendly demeanor, he was not willing to be replaced in her life. To augment

DNA[1] evidence that implicated Mr. Arteaga but was relatively weak, the State offered "motive" evidence under ER 404(b) of domineering, controlling behavior by Mr. Arteaga during the years of his and Ms. Schmidt's relationship.

Mr. Arteaga contends on appeal that the trial court failed to conduct the required analysis before admitting the ER 404(b) evidence and admitted it for an improper purpose. He also contends he received ineffective assistance of counsel when his trial attorney did not move to suppress the DNA evidence and failed to object to testimony from Ms. Schmidt's mother that placed him in a bad light. Finally, he challenges legal financial obligations (LFOs) imposed and domestic violence findings included in his judgment and sentence.

We find no error or abuse of discretion other than the trial court's domestic violence designation of the crime of conviction. We affirm the conviction and remand with directions to strike the domestic violence designation in § 2.1 of the judgment and sentence.

## FACTS AND PROCEDURAL BACKGROUND

On New Year's Day 2012, Kimberly Schmidt was found lifeless on her bed, her head covered by a blood-soaked pillow. Her mother, Toni Schmidt,[2] discovered her. A

---

[1] Deoxyribonucleic acid.

[2] We refer to Toni Schmidt as "Toni" in order to avoid confusion with the victim. No disrespect is intended.

2

handgun inside a black sock lay near Ms. Schmidt's shoulder. The barrel of the gun protruded from a hole in the toe of the sock.

Toni had earlier telephoned Mr. Arteaga, well known to her as Ms. Schmidt's longtime friend,[3] after Ms. Schmidt failed to pick up Toni's granddaughter as planned and could not be reached. Toni even had Mr. Arteaga on the phone when she entered Ms. Schmidt's home, because she was worried about encountering an intruder. When Toni found Ms. Schmidt and told Mr. Arteaga she believed she might be dead, Mr. Arteaga called 911 at Toni's request and then drove to Ms. Schmidt's home.

Upon arriving, Mr. Arteaga approached the crime scene tape and spoke with Detective Michael Drapeau. He spoke to the detective at length, disclosing that while he was married, he had been in a relationship with Ms. Schmidt (a single woman) for over six years, and that the two had ended their romantic relationship in November. He told Detective Drapeau that despite the breakup, he had been with Ms. Schmidt much of the prior day and night. At her request, he had picked up a washing machine she had purchased the prior morning, delivered it to her home, installed it for her, and helped her with a couple of loads of laundry. After he was unable to dispose of her old washing

---

[3] At trial, Toni resisted the characterization of Mr. Arteaga as her daughter's former boyfriend, stating that "they called themselves 'friends.'" Report of Proceedings (RP) at 341. But she added, "I'm an adult. I know there's some fringe benefits going on there." *Id.*

3

machine at a recycling center (he arrived after it closed) he returned to her home and remained there, where, according to him, he and Ms. Schmidt "talked, and laughed, and cried" for a couple of hours and even had sexual relations. Verbatim Report of Proceedings (VRP) (Aug. 7, 2012) at 29. Late that night, because Ms. Schmidt was not feeling well, he traveled to a gas station to pick up nighttime cold medicine to help her sleep. He claimed that after giving her the medicine she fell asleep, and she was sleeping when he left her home at around 3:00 a.m.

Mr. Arteaga also told Detective Drapeau that Ms. Schmidt had recently renewed a romantic relationship with Joseph Regalado, the father of her 12-year-old daughter, and that she had originally planned on spending New Year's Eve with Mr. Regalado. According to Mr. Arteaga, she changed her mind at around 11:30 p.m., perhaps because she wasn't feeling well.

On that New Year's Day afternoon, Mr. Arteaga not only spoke with Detective Drapeau at length, he also turned his cell phone over to a police officer, authorized Detective Drapeau to process the phone, and allowed the detective to take pictures of his back and chest, search his truck, take a DNA buccal (cheek) swab, and accompany Mr. Arteaga to his home, where Mr. Arteaga provided the detective with the clothes he had worn the night before.

An autopsy confirmed the cause of Ms. Schmidt's death was the gunshot wound to her head. It identified the manner of death as homicide. A sample of Ms. Schmidt's

blood taken during the autopsy was sent to the Washington State Patrol's toxicology lab and revealed no alcohol or illegal drugs. It did reveal the presence of diphenhydramine—commonly found in over-the-counter medications such as Tylenol or Tylenol PM—in a high concentration: 0.43 mg/L, well above the normal therapeutic level of 0.05 mg/L. Diphenhydramine causes drowsiness or sleepiness, and slows reaction time.

The state patrol's forensic lab performed analyses on the black sock found on the handgun as well as a similar sock that Toni found in Ms. Schmidt's dirty laundry. The analyst compared the DNA discovered on the socks to reference samples from Mr. Arteaga, Mr. Regalado, Ms. Schmidt, and Toni.

Three sets of DNA were discovered on the sock found over the gun. Ms. Schmidt's DNA and an unidentified minor contributor's DNA were discovered on the side of the sock touching the gun. On the opposite, exposed side of the sock, the analyst detected a mixture of DNA consistent with the combined profiles for Ms. Schmidt and Mr. Arteaga. It was 270 times more likely that the observed DNA profile was a mixture of Ms. Schmidt's and Mr. Arteaga's DNA than that it originated from Ms. Schmidt and an unknown individual selected at random from the U.S. population. Mr. Regalado was excluded as a possible contributor to that mixture.

The test performed on the second sock, the one discovered in the laundry, indicated that Ms. Schmidt was the major contributor. There was also a low level

5

contributor to the DNA on this sock, but Mr. Arteaga, Mr. Regalado, and Toni were all excluded as the low level contributor.

On August 7, 2012, the State interviewed Mr. Arteaga a second time. This time, Deputy Drapeau read Mr. Arteaga his *Miranda*[4] rights. In the roughly 40-minute interview, which was videotaped, Mr. Arteaga repeated much of what he told Detective Drapeau on New Year's Day. Additional disclosures by Mr. Arteaga were that Ms. Schmidt had a PayPal account which was linked to an eBay account that he and she shared, although he stated that "99 percent" of the sales through the eBay account were his. VRP at 49. Mr. Arteaga also stated he provided Ms. Schmidt with the .25 caliber Jennings semiautomatic handgun used to kill her. He told detectives she had wanted a handgun for self-protection and that she ordinarily kept it in a small safe at her bedside.

Late in the interview, Detective Drapeau told Mr. Arteaga that "there's a lot of things that I know now from a forensic standpoint . . . that I didn't know before." VRP at 67. He said he knew Mr. Arteaga must have been in the room with Ms. Schmidt when she was bleeding, and that Mr. Arteaga must either have shot Ms. Schmidt or seen her shoot herself. Mr. Arteaga continuously denied both accusations, insisting that Ms. Schmidt was alive and sleeping when he left. Mr. Arteaga was arrested that day and was charged with premeditated first degree murder two days later.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Before trial, and having learned the State intended to offer evidence that Mr. Arteaga was controlling and domineering in his relationship with Ms. Schmidt, the defense moved in limine to exclude any reference to uncharged criminal incidents and other prior bad acts. The State argued the evidence was admissible to show motive, intent, or res gestae. After taking testimony outside the presence of the jury about what the trial court characterized as the "controlling issues" (discussed in more detail below), it excluded evidence about one incident but ruled that other incidents had been shown to have occurred and would be admitted as "very relevant toward proving the defendant's intent, if you will, premeditation, et cetera, et cetera, motivation." Report of Proceedings (RP) at 265.

At trial, Toni testified that while sorting through Ms. Schmidt's financial affairs after her death, she discovered that an eBay account her daughter maintained with Mr. Arteaga had been emptied of funds "[t]wo days after her death," and that "Mr. Arteaga paid himself the funds that were in the account, her account." RP at 325. Defense counsel did not object.

The jury found Mr. Arteaga guilty of first degree murder while armed with a firearm. The court sentenced him to 360 months and imposed LFOs. Mr. Arteaga appeals.

## ANALYSIS

Mr. Arteaga makes six assignments of error. The first two claim he received

ineffective assistance of counsel when his trial lawyer (1) failed to move to suppress the DNA evidence, and (2) failed to object to evidence about his withdrawal of eBay proceeds from the Paypal account. The third is to the trial court's partial denial of his motion to exclude the ER 404(b) evidence. The fourth is to the court's imposition of LFOs without making an individualized inquiry into his ability to pay. The fifth and sixth are to the court's finding and designation of the crime of conviction as a domestic violence crime.

We address the assignments of error in the order stated.

### *I. Ineffective assistance of counsel*

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to counsel. "To satisfy the constitutional command, an attorney must perform to the standards of the profession; failure to live up to those standards will require a new trial when the client has been prejudiced by counsel's failure." *State v. Walters*, 162 Wn. App. 74, 80, 255 P.3d 835 (2011) (citing *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)).

A court reviewing a claim of ineffective assistance of counsel engages in a two-part test. First, the defendant must show he received deficient representation. *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995) (citing *Strickland v. Washington*, 466 U.S. 668, 688-89, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Deficient performance is determined using an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d

8

668, 705-06, 940 P.2d 1239 (1997). "In this assessment, the appellate court will indulge in a strong presumption that the defendant was properly represented." *Mierz*, 127 Wn.2d at 471 (citing *Strickland*, 466 U.S. at 688-89).

Second, the defendant must show he or she suffered prejudice as a result of the deficient performance. *Id.* (citing *Strickland*, 466 U.S. at 687). Prejudice will result if "'counsel's errors were so serious as to deprive the defendant of a fair trial.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). "This showing is made when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different." *Id.* If one of the two prongs of the *Strickland* test is absent, we need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

### DNA evidence

Turning first to the DNA evidence, Mr. Arteaga argues his trial lawyer should have filed a motion to suppress the state lab's DNA testing as the fruit of an illegal search. As support for his argument, he points to the following testimony from Detective Drapeau about the detective's dealings with Mr. Arteaga on the New Year's afternoon following the murder:

> Q. And when did you take a buccal swab from him for DNA purposes?
> A. Near the end of the interview portion and prior to going and searching his truck.
> Q. Okay. And he did that voluntarily? He didn't have to do that, correct?
> A. He did ask me if he needed a lawyer.
> Q. What'd you tell him?
> A. I said that, um—if I may recall—

9

Q. Sure.
A. —exactly what I told him? (Looking at a document.) I told him that DNA all looks the same initially, so I would like his DNA as a sample to compare which was his and which was not.

RP at 950-51. According to Mr. Arteaga, the detective's response "coerced [him] into providing a DNA sample under the guise that all DNA looks the same, which is untrue." Br. of Appellant at 25.

Swabbing a cheek to procure a DNA sample constitutes a search under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution. *State v. Garcia-Salgado*, 170 Wn.2d 176, 184, 240 P.3d 153 (2010). Absent an exception from the warrant requirement—and the detective had no warrant here—a warrantless search or seizure violates article I, section 7. *State v. MacDicken*, 179 Wn.2d 936, 940, 319 P.3d 31 (2014). Consent to search is an exception. *State v. Hendrickson*, 129 Wn.2d at 71.

For consent to be valid, the individual searched must give consent freely and voluntarily. *State v. O'Neill*, 148 Wn.2d 564, 588, 62 P.3d 489 (2003). If the free and voluntary character of the consent is challenged, the State must prove the individual's consent was not a result of duress or coercion. *Id.*; *State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990). Whether consent was voluntary is a question of fact to be determined from the totality of the circumstances. *O'Neill*, 148 Wn.2d at 588 (citing *State v. Bustamante-Davila*, 138 Wn.2d 964, 981, 983 P.2d 590 (1999)). Factors that

10

may be considered in determining whether one has voluntarily consented include whether *Miranda* warnings were given, the degree of education and intelligence of the individual, and whether he or she was advised of the right to consent. *Id.*

Where it is argued on appeal that a trial lawyer's failure to move to suppress evidence constituted ineffective assistance, the trial court record may be insufficient for the defendant to make the required showing of prejudice, since the State and defendant never had an incentive or opportunity to develop the relevant factual record. In arguing that he demonstrates the deficiency prong, Mr. Arteaga tries to avoid the problem of an insufficient record by arguing that because "[m]oving to suppress would not have involved any risk to Mr. Arteaga," his trial lawyer's performance was per se deficient. Br. of Appellant at 22.

Essentially the same argument was rejected by our Supreme Court in *State v. McFarland*, 127 Wn.2d 322. The defendant in *McFarland* relied on *State v. Tarica*, 59 Wn. App. 368, 374, 798 P.2d 296 (1990), which had found a trial lawyer's failure to move to suppress evidence to be deficient representation based solely on the fact that "the motion is made pretrial and not in front of the jury"— ergo, "there does not appear to be any way to characterize the failure to bring the motion to suppress as a legitimate trial tactic." 127 Wn.2d at 335-36.

*McFarland* overruled *Tarica* insofar as it held that failure to move for suppression of evidence is per se deficient representation under the first prong of the *Strickland* test.

11

*McFarland*, 127 Wn.2d at 337. Even where a motion to suppress does not present risk, *McFarland* recognized "[t]here may be legitimate strategic or tactical reasons why a suppression hearing is not sought at trial." *Id.* at 336. Among them may be a defense lawyer's belief that favorable rulings on pretrial issues are more likely if only colorable arguments are made. "Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *Id.* By relying on an argument of per se deficiency, Mr. Arteaga fails to make this showing.

The record suggests Mr. Arteaga's trial lawyer made a tactical judgment that no colorable argument to suppress the DNA evidence could be made. He filed a motion to suppress other evidence. Had he believed his client involuntarily provided the buccal swab, he could have included that suppression argument as well. But the defense lawyer was aware that Mr. Arteaga repeatedly complied with and consented to police requests on the afternoon following the murder, making it untenable to argue that his consent to the buccal swab request was coerced. And Mr. Arteaga's argument on appeal that he was misled into believing that his DNA would look the same as all other DNA is unpersuasive; he was told the detective wanted the swab as a sample "to compare which was his and which was not." RP at 951. No record has been developed about Mr. Arteaga's education, intelligence and experience, which might have further supported the voluntariness of his consent.

12

Since Mr. Arteaga fails to demonstrate deficient representation, we need not

address the prejudice prong of the *Strickland* test.

Testimony about the eBay account

Mr. Arteaga's second charge of ineffective assistance of counsel is based on his

lawyer's failure to object to Toni's testimony about his and Ms. Schmidt's eBay account.

During trial, Toni testified:

> Q. [THE STATE]. As part of dealing with Ms. Schmidt's effects, did you have to deal with some of her financial issues?
> A. [TONI SCHMIDT]. Um, when she left—no, I didn't. Are you asking before or after?
> Q. [THE STATE]. After her death.
> A. [TONI SCHMIDT]. Oh, yes.
> Q. [THE STATE]. You had to probably make an entire collection—
> A. [TONI SCHMIDT]. We had to go into probate and get all of what the bills were and stuff, yes.
> Q. [THE STATE]. And was there anything with eBay?
> A. [TONI SCHMIDT]. Yes. Um, when we—the computer went down, and so it took a while to get it back on and stuff. And that's when I discovered that there was an eBay account. But I knew there kind of was one, because that's how they were selling stuff.
> Q. [THE STATE]. And was—was there any activity on the eBay account after her death?
> A. [TONI SCHMIDT]. Yes.
> Q. [THE STATE]. And what was that activity?
> A. [TONI SCHMIDT]. Two days after her death Mr. Arteaga paid himself the funds that were in the account, her account.

RP at 324-25. Toni later testified she believed that one reason Mr. Arteaga had a key to

Ms. Schmidt's home was "because of the eBay they were doing." RP at 345.

13

No. 32564-4-III
*State v. Arteaga*

The only other evidence the jury heard about the eBay account was when Mr. Arteaga's videotaped interview with detectives was played. In addition to telling detectives that the eBay dealings were one reason he had a key and routinely went by Ms. Schmidt's house, Mr. Arteaga provided the following responses to the detectives' questions:

> Q: Okay. Did you guys have a Paypal account that you shared?
> A: Yes. She had a Paypal account.
> Q: How did—how did that work?
> A: Any of the items that I sold on [eBay] 99 percent of them were mine. Occasionally she'd have me put some of her stuff on there and then we would just send the money to her bank if I needed something or needed money or I would just use the money out of the account to buy things that I wanted off of [eBay].

VRP at 49.

Mr. Arteaga argues the testimony by Toni that he paid himself funds from the eBay (or PayPal) account was inadmissible under ER 401 and ER 403, and that his attorney's failure to object was deficient and prejudicial. In support of his argument of prejudice, he points to the fact that the prosecutor relied on Toni's testimony in closing argument to imply that Mr. Arteaga did not love Ms. Schmidt as much as he claimed.[5]

---

[5] The prosecutor stated,

> Ms. Schmidt also testified that just interestingly enough there's transactions on the eBay account just three days later. Six and a half years, the person he loves more than his wife is dead by a means that he says he has no idea how, but you got to keep the eBay account going.

RP at 1031.

14

To prevail on a claim of ineffective assistance of counsel based on a failure to object, the defendant must show (1) the absence of legitimate strategic or tactical reason for not objecting, (2) that the trial court would have sustained the objection if made, and (3) the result of the trial would have differed if the evidence had not been admitted. *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

The State's trial theory challenged Mr. Arteaga's claim that he would never hurt Ms. Schmidt with evidence of behavior on his part that seemed inconsistent with his professed devotion, so he was at risk that an objection to Toni's statement on relevance grounds would be overruled. If it was, the objection would draw attention to evidence that, at best, made Mr. Arteaga look insensitive, and at worst, undercut his claim that he loved Ms. Schmidt too much to ever hurt her. Mr. Arteaga's trial lawyer had to weigh that risk against the harm, if any, from the somewhat rambling testimony of Toni—who acknowledged that she, herself, started packing up and taking Ms. Schmidt's belongings the day after her murder. Under these circumstances, Mr. Arteaga cannot demonstrate that his trial lawyer had no legitimate strategic reason for not objecting.

Also, since evidence of emptying the eBay account was only one piece of the State's evidence casting doubt on Mr. Arteaga's professed devotion to Ms. Schmidt, and motive was only one aspect of the State's case against him, he does not demonstrate that the result of the trial would have differed if Toni's testimony had not been admitted.

Given his failure to make those two essential showings, we need not examine how the court would likely have ruled on objections based on ER 401 and 403.

## *II. ER 404(b) evidence*

Mr. Arteaga next contests the admissibility of ER 404(b) evidence about his "controlling issues."

The purpose of ER 404(b) is to prevent the State from suggesting a defendant is guilty because he is a bad or criminal-type person who would be likely to commit the crime charged. *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007). It is not to deprive the State of relevant evidence necessary to establish an essential element of its case. *Id.* To those ends, the rule excludes evidence of prior bad acts by a defendant as proof of his character, but does not exclude such evidence where relevant for another purpose. Before admitting evidence of prior bad acts, ER 404(b) requires that the court "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

Before trial, the State disclosed its intent to offer evidence of "past abusive behavior" by Mr. Arteaga that would demonstrate he was "controlling and possessive of Ms. Schmidt." Clerk's Papers (CP) at 50. It identified two friends of Ms. Schmidt—

16

Desiree Tibbs and Deborah Zimmerman—who could offer evidence that Mr. Arteaga "was very jealous when Ms. Schmidt was with other friends," that he tended to isolate her from others and "make [her] go with him when she clearly did not want to do so," and that he would "attempt to control her behavior and how she dressed." *Id.* It characterized the evidence of control as providing a "more complete picture of the nature of the relationship" between the couple and as bearing on motive, intent and res gestae of why Ms. Schmidt was murdered—according to the State, Ms. Schmidt's murder "was the defendant's ultimate act of control in the relationship." CP at 51.

The anticipated testimony was touched upon several times before trial in motion papers and at hearings. On the second day of trial, the State called Ms. Zimmerman and Ms. Tibbs to testify outside the presence of the jury to the matters proposed to be offered by the State. Ms. Zimmerman had been a friend of Ms. Schmidt's for years, although she had not spoken to Ms. Schmidt in the two years before the murder. Ms. Tibbs had not known Ms. Schmidt for as long, and met her through their joint interest in scuba diving, which was also a passion of Mr. Arteaga's. Ms. Zimmerman and Ms. Tibbs had both participated in out-of-town and overseas scuba diving excursions with Ms. Schmidt and Mr. Arteaga.

Ms. Zimmerman testified that while Ms. Schmidt was social and liked to go out with her friends, Mr. Arteaga preferred having Ms. Schmidt to himself and would "pout" if he and Ms. Schmidt ended up doing something that she, not he, wanted to do. RP at

17

230. One example to which Ms. Zimmerman testified was New Year's Eve 2006, when Mr. Arteaga begrudgingly accompanied Ms. Schmidt and her friends to a restaurant. During dinner, Ms. Schmidt asked him to pass the ketchup, in response to which Mr. Arteaga held the squeeze bottle over Ms. Schmidt's head and ill-temperedly squirted ketchup into her hair. Other examples of controlling behavior to which she testified were Mr. Arteaga's telling Ms. Schmidt how to dress and wear her hair, what she should or should not eat, and keeping her scuba diving equipment in his possession because he didn't like her diving without him.

Ms. Tibbs testified more generally to controlling behavior. She was also asked about a group scuba diving trip to Fiji during which Mr. Arteaga and Ms. Schmidt were heard loudly fighting. Ms. Tibbs testified that Ms. Schmidt screamed at one point, and when Ms. Tibbs saw her later, upset and crying, she inferred that Ms. Schmidt had been hurt by Mr. Arteaga.

After hearing from the witnesses, the trial court announced that it found the evidence of controlling issues "very relevant toward proving the defendant's intent, if you will, premeditation, et cetera, et cetera, motivation." RP at 265. It excluded only the evidence of the presumed assault in Fiji, which it stated had not been proved. The State called Ms. Zimmerman to testify at trial, but did not call Ms. Tibbs.

Mr. Arteaga does not challenge the trial court's ruling that the conduct testified to by Ms. Zimmerman was proved by a preponderance of the evidence. He contends the

18

court failed to create the record required by ER 404(b), the evidence was not admitted for a proper purpose, and that it was unduly prejudicial.

We review the trial court's interpretation of ER 404(b) de novo, as a matter of law. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). If the trial court interprets ER 404(b) correctly, we review its ruling to admit evidence under the rule for an abuse of discretion. *Id.*

### Conducting the balancing test on the record

Having determined that evidence of a prior bad act is admissible for a permitted purpose, a trial judge must balance—on the record—the danger of undue prejudice from admitting the evidence against its probative value. *State v. Carleton*, 82 Wn. App. 680, 685, 919 P.2d 128 (1996). Our Supreme Court has stated, "We cannot overemphasize the importance of making such a record." *State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984). While the failure to engage in the balancing on the record is error, it is harmless if a reviewing court can determine from the record that compliance with the record making requirement would not have changed the trial court's decision to admit the evidence. *Carleton*, 82 Wn. App. at 686.

At the end of the first day of Mr. Arteaga's trial, the trial court discussed with the lawyers the fact that it would hear the proposed ER 404(b) evidence from Ms. Zimmerman and Ms. Tibbs the next day. It stated, "[L]et's make a determination that it actually happened, and then I need to do the weighing of the prejudice versus the

19

probative value." RP at 161. Clearly, the trial court had in mind the need to weigh the probative and prejudicial values of the evidence before ruling on admissibility. We can infer that its ruling the following day reflected that weighing. We are satisfied that articulating the balancing would not have changed the court's decision to admit the evidence. Its silent balancing was error, but harmless.

### Purpose for which the evidence was admitted

The burden of demonstrating a proper purpose for admitting the evidence rests on the State. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003), *aff'd*, 266 Fed. Appx. 647 (9th Cir. 2008). Here, the State argued to the trial court that evidence of the controlling behavior was admissible for the purpose of showing motive, intent, or res gestae. The trial court admitted the evidence as relevant on issues of intent and motivation, although not as res gestae. It admitted evidence of the ketchup incident on the same basis and, while recognizing that it was remote in time, stated it demonstrated a pattern.

Evidence of prior bad acts is admissible for purposes other than proof of character, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). The list is not exclusive. *State v. Baker*, 162 Wn. App. 468, 473, 259 P.3d 270 (2011).

No Washington decision holds that where a victim is murdered after terminating a relationship, the jilted lover's history of controlling behavior is relevant and admissible

20

under ER 404(b) to establish motive. But common sense says that it can be. The

following discussion in a 2014 decision of the Kentucky Supreme Court is persuasive:

> Southworth's exertion of control was proof of a motive for killing Umi, at least when combined with proof that she was divorcing him and moving with Almira to Nashville. If he was controlling and was about to lose that control, then he had a motive to act. That makes the testimony relevant, especially given that he denied even having a motive and denied having killed his wife. *See, e.g., Davis v. Commonwealth*, 147 S.W.3d 709, 725 (Ky. 2004) (noting that the need for evidence proving motive is greatest and relevance is clearest when defense is denial of a criminal act); *see also People v. Fisher*, 449 Mich. 441, 537 N.W.2d 577, 582 (1995) ("In cases . . . in which the proofs are circumstantial and the only witness is the accused, evidence of motive would be highly relevant.")[, *overruled in part on other grounds by People v. Houthoofd*, 487 Mich. 568, 790 N.W.2d 315 (2010)].

*Southworth v. Commonwealth*, 435 S.W.3d 32, 57 (Ky. 2014); *accord Brunson v. State*,

368 Ark. 313, 323-24, 245 S.W.3d 132 (2006) (testimony of murder victim's coworkers

as to her ex-husband's obsessive behavior demonstrated "the drastic measures that [he]

was willing to take to keep [her] under his control" and established his possible motive in

murdering her and her boyfriend).

Mr. Arteaga nonetheless argues, citing *State v. Sargent*, 40 Wn. App. 340, 698

P.2d 598 (1985), *rev'd*, 111 Wn.2d 641, 762 P.2d 1127 (1988), that because Ms.

Zimmerman had not seen Ms. Schmidt for two years and the ketchup incident took place

eight years before her murder, Ms. Zimmerman's evidence was too remote in time to be

admissible as to intent or motive. In *Sargent*, the appellate court held that evidence that

the defendant had admitted hitting his wife on one occasion eight months before her

21

death was too tenuous to constitute evidence of his intent on the night of her murder. *Id.* at 352.

*Sargent* is distinguishable. In that case, which was fraught with other reversible error, the court had admitted evidence that the defendant told an acquaintance, eight months before his wife's death, that he hit his wife once during an argument and, upset over having done so, sought counseling. *Id.* at 351. The evidence was admitted to establish intent, not motive.

In *State v. Powell*, 126 Wn.2d 244, 260, 893 P.2d 615 (1995), our Supreme Court, quoting Black's Law Dictionary, distinguished motive from intent:

> "Motive" is said to be the moving course, the impulse, the desire that induces criminal action on part of the accused; it is distinguished from "intent" which is the purpose or design with which the act is done, the purpose to make the means adopted effective.

126 Wn.2d at 260 (quoting BLACK'S LAW DICTIONARY 1014 (6th ed. 1990)). "Motive and prior conduct of a defendant is as much a part of the substantive evidence to show premeditation as is the immediate reflective deliberation which precedes the act itself." *State v. Ross*, 56 Wn.2d 344, 349, 353 P.2d 885 (1960).

The evidence offered by the State against Mr. Arteaga was not a single remote event offered to show intent, but a pattern of behavior demonstrating an attitude on Mr. Arteaga's part that could explain why he would kill someone with whom he appeared to remain friendly. Ms. Zimmerman's evidence about the relationship was dated, according

to her, because Mr. Arteaga had isolated Ms. Schmidt from Ms. Zimmerman and other friends. Even Mr. Arteaga told Detective Drapeau that Ms. Zimmerman was Ms. Schmidt's "best friend when I met her," telling the detective, "[T]hey did everything together. They were like sisters." VRP at 64. The fact that the evidence offered by Ms. Zimmerman was at least a couple of years old goes to its weight, not its relevance.

Mr. Arteaga fails to show the trial court abused its discretion in admitting the evidence.

### Probative and prejudicial values

Mr. Arteaga's argument that the trial court erred in its implicit balancing of probative value versus undue prejudice essentially repeats his argument that there was no proper purpose for admitting the evidence at all. Here, too, he argues that the remoteness in time of Ms. Zimmerman's observation of the Schmidt-Arteaga relationship made it weak evidence, and thereby easily outweighed by the risk of unfair prejudice. We have already rejected the argument that the evidence was too remote in time to have probative value. Trial courts have considerable discretion to consider the relevancy of evidence and to balance its probative value against its possible prejudicial impact. *State v. Barry*, 184 Wn. App. 790, 801, 339 P.3d 200 (2014). Mr. Arteaga fails to show a manifest abuse of discretion by the trial court here. *See id.* at 801-02.

23

### *III. Domestic violence designation*

Mr. Arteaga points out that the judgment and sentence states that for the crime of conviction, "domestic violence was pled and proved" and that the jury found Mr. Arteaga guilty of a domestic violence crime. *See* CP at 355-56. Yet upon the first amendment of the information, the crime was not charged as a domestic violence crime, nor was it later prosecuted as one. The State concedes error.

We accept the State's concession and will remand with directions to strike the domestic violence designation.

### *IV. Legal financial obligations*

Finally, Mr. Arteaga asks this court to exercise its discretion and review the trial court's allegedly improper imposition of LFOs without considering his present or future ability to pay.

Since Mr. Arteaga did not object to the trial court's imposition of LFOs, a threshold issue is whether he may complain about them for the first time on appeal. RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them. *State v. Guzman Nunez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)), *aff'd*, 174 Wn.2d 707, 285 P.3d 21 (2012)).

In this case, because remand is required to correct the erroneous domestic violence designation, we consider Mr. Arteaga's challenge. But upon consideration, it fails.

Under RCW 10.01.160(3), "[t]he court shall not order a defendant to pay costs unless the defendant is or will be able to pay them," but the statute applies to only discretionary LFOs. "[F]or *mandatory* legal financial obligations, the legislature has divested courts of the discretion to consider a defendant's ability to pay when imposing these obligations." *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013).

All of the LFOs imposed on Mr. Arteaga were mandatory. They included a $500.00 victim assessment fee required by RCW 7.68.035, a $200.00 criminal filing fee required by RCW 36.18.020(2)(h), and $4,065.70 in restitution, required by RCW 9.94A.753(5). They also included a $100.00 DNA collection fee required by RCW 43.43.754 for some crimes, although not the crime of conviction here.[6] As a result, the court was not required by RCW 10.01.160(3) to consider on the record whether Mr. Arteaga had the present or future ability to pay the obligations.

We affirm the conviction and remand with directions to strike the domestic violence designation at § 2.1 of the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the

---

[6] The inapplicability of the fee is not raised by Mr. Arteaga. The court may have intended to impose the crime lab fee required by RCW 43.43.690.

No. 32564-4-III
*State v. Arteaga*

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Fearing, C.J.