IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  38780-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS M. MORALES HERNANDEZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Luis Morales Hernandez was charged with first degree child molestation and attempted second degree child molestation.  Following a jury trial, he was convicted of first degree child molestation and sentenced to 65 months to life of imprisonment, subject to the provisions of RCW 9.94A.507.  The jury was unable to reach a unanimous verdict on the second count.

Mr. Hernandez appeals contending that he was afforded ineffective assistance of counsel, that the evidence was insufficient to support the essential element of sexual contact,[1] and that the State introduced improper opinion testimony.  We agree that Mr. Hernandez received ineffective assistance from his trial counsel and reverse his

---

[1] Pursuant to RAP 10.10, Mr. Hernandez filed a statement of additional grounds for review (SAG).  We decline to address the issues presented in his SAG as his appellate counsel adequately briefed the alleged errors.

conviction.[2]  We disagree the evidence was insufficient to support the essential element

of sexual contact.

BACKGROUND

On April 27, 2020, the State filed an information that charged Mr. Hernandez with

first degree child molestation (count 1) and attempted second degree child molestation

(count 2).  The listed victim in count 1 is M.L.,[3] born February 25, 2014.  The listed

victim in count 2 is G.E.R., born February 8, 2006.

For a few years preceding April 2020, Maria Hernandez[4] rented rooms to Mr.

Hernandez and a second tenant.  Ms. Hernandez's daughter, E.R., has two

daughters—M.L. and G.E.R.  Ms. Hernandez frequently cared for her granddaughters

while E.R. worked.  Due to lethargy brought on by a medical condition, Ms. Hernandez

would often nap while her granddaughters were in her care.

In 2019, as Ms. Hernandez and her granddaughters were making plans to attend a

party, Mr. Hernandez picked up G.E.R. in attempt to hug her.  According to G.E.R., it felt

---

[2] With this holding, we need not address Mr. Hernandez's contention that the State admitted improper opinion evidence.

[3] To protect the privacy interests of M.L., we use her, her sister's and their mother's initials throughout this opinion.  Gen. Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp& ordnumber=2012_001&div=III.

[4] There is no relation between Luis Morales Hernandez and Maria Hernandez.

as though Mr. Hernandez was seeking to put his hand in her pants. G.E.R. ran from Mr. Hernandez and informed her grandmother of the incident. Ms. Hernandez chose against reporting Mr. Hernandez's actions to law enforcement.

Later, M.L. told G.E.R. that Mr. Hernandez had touched her "where she goes pee pee." Rep. of Proc. (RP) (Munoz) at 395. G.E.R. informed Ms. Hernandez of what M.L. had reported. Ms. Hernandez responded that "she knew, and she just wanted to see it happen again." RP (Munoz) at 395. The anxiety that G.E.R. experienced after becoming aware of Mr. Hernandez's behavior, coupled with the fear of it reoccurring, led G.E.R. to notify her counselor. G.E.R.'s counselor reported the alleged abuse to child protective services who, in turn, contacted law enforcement.

Detective Kirk Nebeker of the Kennewick Police Department was assigned the investigation into Mr. Hernandez's purported conduct. Detective Nebeker promptly contacted E.R. in an effort to coordinate forensic interviews of the children. On April 15, 2020, E.R. took her daughters to forensic interviewer Mari Murstig. While Detective Nebeker watched from an observation room, M.L. told Ms. Murtsig that when she was 4 or 5 years old, Mr. Hernandez touched her vagina two or three times underneath her clothing. M.L. stated the touching occurred at Ms. Hernandez's residence while her grandmother was in her bedroom. G.E.R. disclosed to Ms. Murstig that the year prior, when she was 13 years old, Mr. Hernandez reached around her in an attempt to put his hand into her pants.

No. 38780-1-III
*State v. Hernandez*

On April 22, 2020, Detective Nebeker arrested Mr. Hernandez at his residence. Because Mr. Hernandez's first language is Spanish, the entirety of the communication between he and Detective Nebeker was in Spanish. Detective Nebeker lacks any formal education in the Spanish language, but acquired familiarity with the language in 1995 while serving a two-year church mission in Mexico. Over the years he had developed fluency in the language.

Following Mr. Hernandez's arrest, Detective Nebeker read him the *Miranda*[5] warnings from a preprinted card. Detective Nebeker then placed Mr. Hernandez in his patrol vehicle and conducted a brief interview that was neither audio nor video recorded. At trial, Detective Nebeker testified to the English interpretation of the statements Mr. Hernandez allegedly made at the scene:

> [STATE:] And, Detective Nebeker, after the defendant was advised of his rights, did he make any statements to you there at the scene?
> [NEBEKER:] Yes, he did.
> [STATE:]: And can you advise the jury as to those statements?
> [NEBEKER:] Sure. There were a couple different versions. The first version when I advised him of the nature of this investigation, he denied knowing what I was talking about. Denied the allegations.
> . . . .
> [STATE:] And did he indicate what kind of relationship that he had with [G.E.R.] and [M.L.]?
> [NEBEKER:] He said he had a—a good, playful relationship with them.
> [STATE:] Okay, and did he describe anything else about that relationship or whether it had changed at some point?

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

> [NEBEKER:] Yes. He said at one point Maria came to him and asked him not to be so—not to be as playful and interactive with the girls, and he said he respected her request and had backed off since then.
>
> [STATE:] And after that—you said that the defendant initially denied the allegations.
>
> After that, did he make any admissions regarding [M.L.]?
>
> [NEBEKER:] He did. He admitted to touching her sexually.

RP (Munoz) at 443-44.

As Detective Nebeker's questioning continued, Mr. Hernandez became increasingly emotional and requested the conversation be moved to a private location. Detective Nebeker obliged and the two traveled a couple of blocks to the Kennewick Police Station. Once at the police station, Detective Nebeker continued the interview, this time with it being audio and video recorded. At trial, Detective Nebeker testified to the English interpretation of the statements Mr. Hernandez allegedly made while at the police station:

> [STATE:] And when you were talking at the police station, did the defendant give you more details as to his sexual abuse of [M.L.]?
>
> [NEBEKER:] He did.
>
> [STATE:] And can you advise what those details were?
>
> [NEBEKER:] He disclosed that there were three incidences where he touched [M.L.] sexually: two of them was over the clothing for a couple seconds, and then he said on one of the occasions he touched her vaginal area under the clothing for about three seconds.
>
> [STATE:] And did he indicate what he and [M.L.] were doing, like any activity or whatnot, when he did these things?
>
> [NEBEKER:] I don't recall anything specific other than, I think, just being playful.
>
> [STATE:] Okay, and did the defendant indicate to you anything else about that conduct with [M.L.]?

> [NEBEKER:]  He—he had told me that afterwards he felt bad, and he knew it was wrong.
> [STATE:]  And did the defendant make any admissions to you regarding [G.E.R.]?
> [NEBEKER:]  No, he did not.

RP (Munoz) at 445-46

Mr. Hernandez testified at trial.  Mr. Hernandez explained to the jury that he had a good, playful relationship with the children.  He denied ever attempting to place his hands into G.E.R.'s pants and claimed he merely lifted her up by her waist.  Mr. Hernandez's testimony regarding his physical contact with M.L. mirrored that of the second version of the statement he provided Detective Nebeker at the scene—that while playing a spinning game he had accidently touched M.L.  Mr. Hernandez denied ever touching M.L.'s vagina and claimed that if it did occur it was brief and accidental.

After the defense rested its case, the State recalled Detective Nebeker.  Detective Nebeker testified to the English interpretation of additional statements Mr. Hernandez allegedly made at the scene:

> [STATE:]  And you previously testified that initially the defendant had multiple versions of what occurred; is that correct?
> [NEBEKER:]  That is correct.
> [STATE:]  Okay, and was one of those versions consistent with what you heard him testify here today?
> [NEBEKER:]  One of the versions was.
> [STATE:]  Okay, and when did he provide that version to you?
> [NEBEKER:]  That version was the second version—
> [STATE:]  Okay.
> [NEBEKER:]  —but not the final version.
> [STATE:]  Okay.  What was the first version?

6

[NEBEKER:] The first version was a full denial. Not knowing what I was talking about.

[STATE:] Okay, and then the second version was?

[NEBEKER:] That there may have been accidental touching of those areas while playing.

[STATE:] Okay, and then what was the next version?

[NEBEKER:] The next version was saying that . . . [y]es, I did touch her there on multiple occasions: two times over clothing, one time under clothing. The one under clothing where he touched her vagina under the underwear, that it lasted for about three seconds. He knew it was wrong once he finished doing it, and he felt bad.

. . . .

[NEBEKER:] He—he said that he did touch her sexually.

RP (Munoz) at 589-91.

The State then solicited testimony from Detective Nebeker about the recorded interview at the police station:

[STATE:] And during that conversation, is that when he provided the additional details regarding [M.L.]?

[NEBEKER:] Correct.

[STATE:] Okay, and what were those details specifically?

[NEBEKER:] That he did touch her sexually three times: two times over the clothing but that it was only briefly, a couple seconds, and then he did say that on one of those occasions, the third time, he actually put his hand under her underwear against the skin for about three seconds, and then he said he stopped and he felt bad and knew it was wrong.

RP (Munoz) at 592-93.

Prior to trial, the court held a confession procedure under CrR 3.5. Mr. Hernandez's recorded interview was played during the hearing, but an English interpretation of the interview was not offered. The State advised the court that the recording was inadmissible under the Washington State Criminal Records Privacy Act,

7

chapter 10.97 RCW. Albeit the recording may have been inadmissible, the State contended that Mr. Hernandez's statements were admissible as derivative evidence. The court and Mr. Hernandez's counsel agreed with the State's analysis.

At trial, M.L. testified that Mr. Hernandez touched her one time on top of her clothes while on the couch. G.E.R. testified that Mr. Hernandez lifted her up while hugging her and attempted to put his hand into her pants. Ms. Hernandez testified that she often provided childcare to the children, but would frequently nap in her bedroom while they were in her care. Ms. Hernandez testified she was unable to see the living room from her bedroom.

The jury also heard testimony from Abel Campos, a private investigator retained by the defense. Mr. Campos testified that he was proficient in the Spanish language and had reviewed the recorded interview between Detective Nebeker and Mr. Hernandez. During Mr. Campos's testimony, the State objected to him attempting to discuss Detective Nebeker's interview method. During a sidebar, the court cautioned defense counsel that should Mr. Campos continue to testify about the recording, the door may be opened for the recording to be admitted into evidence. Defense counsel then abandoned the line of questioning.

The jury found Mr. Hernandez guilty of first degree child molestation and was unable to reach a unanimous verdict on the attempted second degree child molestation

8

charge.[6]  The court sentenced Mr. Hernandez to 65 months to life of imprisonment,

subject to the provisions of RCW 9.94A.507.

Mr. Hernandez timely appealed.  After filing his notice of appeal, we granted Mr.

Hernandez's motion to supplement the record with an English interpretation of the

recorded interview that was interpreted by a qualified, independent interpreter

(hereinafter "authentic interpretation").  The portion of the authentic interpretation

relevant to this appeal follows:

> [NEBEKER:]  When—so how long passed until the first time there was some touch sexually with one of the girls.
> [HERNANDEZ:]  I couldn't give you a date.  A year, ab—
> . . . .
> [HERNANDEZ:]  —about a year.
> [NEBEKER:]  And when was the last time?  Approximately?
> [HERNANDEZ:]  Yeah, like, two years.
> [NEBEKER:]  And about how many times do you think you—you have touched [M.L.]?
> [HERNANDEZ:]  Two or three times.
> [NEBEKER:]  And how many times have you touched or tried to touch [G.E.R.]?
> [HERNANDEZ:]  Once.
> . . . .
> [NEBEKER:]  And how did you feel afterwards?
> [HERNANDEZ:]  Bad.  Bad, because I was reliving my—my own situation.
> . . . .
> [NEBEKER:]  Um . . . now I—I explained before that [M.L.] said that you put a hand under her undies touching her vagina.  Um, was it the same thing those two or three times?

---

[6] The State later moved to dismiss the attempted second degree child molestation charge.

[HERNANDEZ:]  No.

[NEBEKER:]  Explain to me what happened.

[HERNANDEZ:]  Ah, well she was always really affectionate and she pl—plays a lot—

. . . .

—she plays a lot, and it wasn't, it wasn't always the same.  Um, the—the second time was accidentally when I was trying to carry her.  So, we would often spin around, I'd grab her by her—uh, arms or her, under her, by her stomach—

. . . .

—and we would spin around, and it was accidental when I feel that she is slip—slipping and so I just tried to hold onto her, like, like this.

. . . .

That was the second time.  Um [sighs] the third time was when . . . we were also playing when she wanted me to lift her up and lift her up and lift her up.  Because she likes playing up high, having her up high—

. . . .

—and when I was putting her down was when I pulled her and lowered her down and I did touch her—her—vagina when I was putting her down.

[NEBEKER:]  For like how many seconds or minutes?

[HERNANDEZ:]  It's just as I'm putting her down, I had her sitting on my shoulders here, I put her down and as I'm putting her down [unintelligible] two seconds.

[NEBEKER:]  . . . And I'm sorry if it is embarrassing to talk of this but, um, it's important to know how—the moment when you're touching, um, did you have a reaction or feel desire or—

[HERNANDEZ:]  No—

[NEBEKER:]  —or sexual intent?

[HERNANDEZ:]  No.  [. . .]  No, I don't feel those desires.

[NEBEKER:]  If not, why did you touch it—

. . . .

[HERNANDEZ:]  I don't know.  Like I said, I really don't even know what I was thinking.  Because after doing it, I relive that time in my—my past.

[NEBEKER:]  She explained one time she was siting on the floor and you around the sofa watching tv or something like that and you hugged it and was this the first time?

10

[. . .]

The way she explained it was that it wasn't like playing and you explained about [unintelligible].

[HERNANDEZ:] Yes. Oft—it's like I was saying, we would play often. We would play often. And she has always been a very loving, very affectionate girl.

[NEBEKER:] And you remember this day that is—she is explaining?

[HERNANDEZ:] No. No, I remember when she was sitting on the floor and I would always touch her head, like, '[M.L.], how are you?'

[NEBEKER:] And so, how did the first time happen?

[HERNANDEZ:] Playing.

[NEBEKER:] And under the undies for a few—

[HERNANDEZ:] No.

[NEBEKER:] —a few seconds as well, or how did it go the first time?

[HERNANDEZ:] No, the thing is I don't remember the first time. I mean, I remember when she was sitting on the couch, I stroked her head, that was the time that she—or I'm confusing that situation. I don't know. The second time, I do remember when we were playing, I was spinning her, I grabbed her and spun her around and when I felt that she was slipping that was when I tried to hang on so that I wouldn't drop her. That was the second time. The third time was when I had her in my ar—on my—on my shoulders, as I was putting her down, I did this, and I grabbed her and put her down.

[NEBEKER:] Mkay [sic], but did you put a hand under her underwear, her undies?

[HERNANDEZ:] No. When I was getting her off my shoulders it wasn't under—it wasn't under her—her panties.

[NEBEKER:] [unintelligible] it was on top?

[HERNANDEZ:] Yes. It is when I'm putting her down, I just braced myself and accidently, it's like, let's suppose this is the person, as I'm putting her down I just, I grabbed her and put her down.

[NEBEKER:] But something is clear, yes. But then if it was pure accident there's no need to feel guilty. Then if it wasn't pure accident—

[HERNANDEZ:] Because—

[NEBEKER:] —did you use it as an excuse to touch it?

[HERNANDEZ:] No, like—

11

[NEBEKER:]  Similar?

[HERNANDEZ:]  ——it's not an excuse.  It's not an excuse because when you are putting her down you can grab her by the arms

. . . .

You can gr——properly grab her arms.  So, it's not an excuse.  I was saying the whole time——anyone would have the same reaction.  Put her down and I, I touched her and put her down.  That was it.

[NEBEKER:]  You have explained three separate times.  Um, how many times, how many times could it have no——uh, that your hand went under her pan——her underwear?

. . . .

[HERNANDEZ:]  Once.

[NEBEKER:]  And how many seconds were you touching her?

[HERNANDEZ:]  Some . . . three seconds?

[NEBEKER:]  And how did she react?

[HERNANDEZ:]  She was just dizzy.  Because we were spinning and spinning and spinning when I felt that I was losing my grip that was when——and I put my hand, I stop spinning, we stop and . . . and [unintelligible] she's dizzy and I am too.

[NEBEKER:]  And this part is very important.  Was it touching it on the outside or did a finger go inside.

[HERNANDEZ:]  On the outside.

Clerk's Papers (CP) Supp. at 156-64 (some alterations in original).

## ANALYSIS

On appeal, Mr. Hernandez contends he was afforded ineffective assistance of counsel and the evidence was insufficient to support the essential element of sexual contact.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Hernandez argues that his trial counsel was ineffective by failing to engage a qualified, independent interpreter to provide an authentic interpretation of the recorded

interview.  Mr. Hernandez posits that without an authentic interpretation, Detective Nebeker was permitted to mischaracterize his statements to the jury.  Further, Mr. Hernandez claims the absence of an authentic interpretation forestalled his attorney's ability to effectively cross-examine the detective.

The State responds that there were legitimate tactical reasons why Mr. Hernandez's counsel chose not to emphasize Mr. Hernandez's statements.  The State argues that the statements made by Mr. Hernandez at the scene, which were not recorded, were duplicative of those made in the recorded interview and that admission of the recording would have reinforced the earlier unrecorded statements.  The State further notes that Mr. Hernandez's investigator, Mr. Campos, was proficient in Spanish and reviewed the recording.  With the benefit of Mr. Campos's input, the State contends defense counsel was likely aware of Mr. Hernandez's actual statements.  Finally, the State asserts that Mr. Hernandez is unable to show he was prejudiced because the primary evidence consisted of the statements Mr. Hernandez made at the scene, not those contained in the recorded interview.

We agree that Mr. Hernandez's trial counsel was deficient in failing to obtain an authentic interpretation of the recorded interview.  The lack of an authentic interpretation permitted the detective to mischaracterize Mr. Hernandez's statements, precluded his attorney from effectively challenging the detective's testimony, and hindered Mr.

Hernandez's ability to seek admission of exculpatory statements he made to the detective. Accordingly, we reverse Mr. Hernandez's conviction.

Defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). Ineffective assistance of counsel claims are reviewed de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

A defendant alleging ineffective assistance of counsel bears the burden of showing deficient representation. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Thus, to succeed on a claim of ineffective assistance of counsel, a defendant bears the burden of showing that his counsel's performance fell below an objective standard of reasonableness based on consideration of all the circumstances and, if so, that there is a reasonable probability that but for counsel's poor performance, the outcome of the proceedings would have been different. *Id.* If either element is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

In reviewing the record, there is a strong presumption that counsel's performance was reasonable. *McFarland*, 127 Wn.2d at 335. The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.

14

Ct. 2574, 91 L. Ed. 2d 305 (1986). When counsel's conduct can be characterized as a legitimate trial strategy or tactic, their performance is not deficient. *Kyllo*, 166 Wn.2d at 863.

Even if counsel's performance is found to be deficient, a defendant must also affirmatively prove prejudice. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). This requires more than simply showing that "the errors had some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant demonstrates prejudice by showing that the proceedings would have been different but for counsel's deficient representation. *McFarland*, 127 Wn.2d at 337. "This assessment is made by weighing 'the totality of available mitigation evidence—both that adduced at trial, and the evidence adduced in the [collateral] proceeding . . . against the evidence in aggravation.'" *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 36, 296 P.3d 872 (2013) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).

TRIAL COUNSEL'S FAILURE TO INVESTIGATE

Mr. Hernandez contends his trial attorney was deficient, and thus did not meet the applicable standard of reasonableness, by failing to adequately investigate his case. We agree.

15

A defense attorney's actions may be deficient if he or she neglects to thoroughly investigate both the law and the facts of the case. *Wiggins v. Smith*, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). However, "a heavy measure of deference" is given to defense counsel's decision to not investigate. *Id*. at 522. If defense counsel investigates the law and facts of the case, and that investigation supports their tactical and strategic decisions at trial, then their actions are not deficient. *Id*. at 522-23. "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'" *Id*. at 523 (quoting *Strickland*, 466 U.S. at 688). When determining what constitutes prevailing professional norms, we may consider the American Bar Association's (ABA) *Standards for Criminal Justice* as a guide. *Id*.

The ABA *Standards* "may be relevant in judicial evaluation of constitutional claims regarding the right to counsel." 1 ABA STANDARDS FOR CRIMINAL JUSTICE std. 4-1.1(b) (4th ed. 2017). Under ABA *Standards* std. 4-4.1(c), defense counsel has a duty to secure relevant information in possession of the prosecution, law enforcement authorities, and others, as well as to independently investigate. Defense counsel should evaluate the prosecutor's evidence and determine whether the evidence needs retesting or reevaluation.

Defense counsel should further consider whether it would be in their client's best interest to engage outside investigators or experts. ABA STANDARDS std. 4-4.1(d).

Should the defendant lack sufficient resources to pay for necessary investigative services, defense counsel should seek resources from the court, the government, or donors. ABA STANDARDS std. 4-4.1(e). Under CrR 3.1(f), a superior court can authorize reasonable compensation for investigative, expert, or other services rendered on behalf of a defendant who is financially unable to secure such services. *State v. Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934 (2006).

When a case involves the language interpretation or translation of a defendant's statements, the interpretation or translation must be made by an independent party. *State v. Huynh*, 49 Wn. App. 192, 203-04, 742 P.2d 160 (1987). Recognizing the importance of accurate interpretations, our Supreme Court adopted the strict standards for interpreters used in judicial proceedings. *See* GR 11.

Here, Detective Nebeker was neither qualified as an interpreter nor was he a disinterested witness. Detective Nebeker's informal instruction in the Spanish language and close relationship with the State calls into question the accuracy and trustworthiness of his interpretation. As discussed below, the only element of first degree child molestation Mr. Hernandez contested was whether the touching constituted sexual contact. Because of the substantial weight the jury likely gave to Detective Nebeker's interpretation of Mr. Hernandez's statements, defense counsel was deficient in failing to investigate the accuracy of the detective's interpretation. An authentic interpretation of

the interview would have exposed the detective's mischaracterization of Mr. Hernandez's statements.

The State argues the lack of an authentic interpretation is benign because Mr. Campos, who is Spanish-speaking, reviewed the recording for the defense. We find this argument unpersuasive. Like the detective, we are unsure whether Mr. Campos is qualified to accurately interpret the recording. Moreover, Mr. Campos's memory of what was discussed during the interview does little to assist defense counsel with challenging the detective's testimony during cross-examination. Defense counsel's decision to not enlist the assistance of a qualified interpreter does not amount to a legitimate trial strategy or tactic, especially in light of CrR 3.1(f) authorizing the retention of an interpreter at public expense.

PREJUDICE TO MR. HERNANDEZ

Mr. Hernandez argues he was prejudiced by the lack of an authentic interpretation of the recorded interview. We agree.

To convict Mr. Hernandez of first degree child molestation, the State was required to prove:

> (1) That on or about the time intervening between February 25, 2018, and December 31, 2019, the defendant had sexual contact with [M.L.];
>
> (2) That [M.L.] was less than twelve years old at the time of the sexual contact and was not married to the defendant;
>
> (3) That [M.L.] was at least thirty-six months younger than the defendant; and

18

(4) That this act occurred in the State of Washington.

CP at 114.  During both interviews and at trial, Mr. Hernandez only contested one element of the crime—whether the touching was sexual contact.

"Sexual contact means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party."  CP at 109.  In order to prove sexual contact, "the State must establish the defendant acted with a purpose of sexual gratification."  *State v. Stevens*, 158 Wn.2d 304, 309, 143 P.3d 817 (2006).  Therefore, sexual contact "continues to require a showing of purpose or intent."  *State v. French*, 157 Wn.2d 593, 611, 141 P.3d 54 (2006).  "Thus, while sexual gratification is not an explicit element of . . . child molestation, the State must prove a defendant acted for the purpose of sexual gratification."  *Stevens*, 158 Wn.2d at 309-10.

During the recorded interview, Mr. Hernandez repeatedly claimed his touching of M.L. was accidental.  In spite of his statements, the detective introduced the topic of sexual contact when, early in the interrogation, he asked Mr. Hernandez, "When—so how long passed until the first time there was some touch sexually with one of the girls."  CP Supp. at 157.  The State adopted this narrative when, at trial, it asked Detective Nebeker, "And when you were talking at the police station, did the defendant give you more details as to his sexual abuse of [M.L.]?"  RP (Munoz) at 445.  Without an authentic interpretation, defense counsel was incapable of challenging these inaccurate assertions.

19

Indeed, when asked about sexual gratification, Mr. Hernandez told the detective he did not "feel those desires." CP Supp. at 161.

Moreover, without an authentic interpretation, defense counsel was unable to challenge the detective's misleading testimony that Mr. Hernandez admitted, "Yes, I did touch her there on multiple occasions: two times over clothing, one time under clothing." RP (Munoz) at 589. The authentic interpretation reveals that Mr. Hernandez only admitted to accidently touching M.L.'s vagina on two occasions. When the detective pressed Mr. Hernandez about the first incident (that allegedly occurred on the couch), Mr. Hernandez denied any memory of the event. If armed with an authentic interpretation, defense counsel could have sought admission of Mr. Hernandez's exculpatory statements to rebut the detective's testimony.

Contrary to the State's argument that the unrecorded interview contained inculpatory statements independent of the recorded interview, the lack of an authentic interpretation prevented defense counsel from effectively cross-examining the detective. If challenged on the veracity of the recorded statements, the detective's credibility surrounding the unrecorded statements certainly would have been met by the jury with cynicism. Given that the State lacked any physical evidence, the State's case rested entirely on the witnesses' credibility, much of which defense counsel was unprepared and unable to challenge.

A proper investigation into Mr. Hernandez's case would have led trial counsel to retain an independent qualified interpreter. With the benefit of a qualified interpreter, trial counsel could have oppugned the detective's interpretation of Mr. Hernandez's statement, challenged the detective's credibility, and sought admission of exculpatory statements. There exists a reasonable probability that the outcome of Mr. Hernandez's trial would have been different had his trial attorney been equipped with an authentic interpretation of Mr. Hernandez's statement.

SUFFICIENCY OF THE EVIDENCE

Mr. Hernandez contends there was insufficient evidence to support the essential element of sexual contact. Specifically, Mr. Hernandez claims the evidence failed to establish that he touched M.L. for the purpose of his sexual gratification. By contrast, the State asserts that, in viewing the evidence in a light most favorable to the State, there was sufficient evidence to establish that Mr. Hernandez's actions were done with the intent of receiving sexual gratification. We agree with the State.

The due process clause of the Fourteenth Amendment to the United States Constitution requires the State to prove every element of an alleged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). If, at trial, the State fails to present sufficient evidence to support the elements of a crime, double jeopardy prohibits a retrial. *Burk v. United States*, 437 U.S. 1, 11, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). The double jeopardy clause of the Fifth Amendment to

21

the United States Constitution does not afford the State a second opportunity to supply evidence in a second trial that it failed to muster in the first. *Id*.

When there is a challenge to the sufficiency of the evidence, we determine whether, "'after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Roth*, 131 Wn. App. 556, 561, 128 P.3d 114 (2006) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "'A claim of insufficiency of the evidence admits the truth of all of the State's evidence and all inferences that can be reasonably drawn therefrom. All reasonable inferences from the evidence must be drawn in favor of the State and most strongly against the defendant.'" *Id*. (citation omitted) (quoting *Salinas*, 119 Wn.2d at 201).

On review, we do not determine "whether [we] believe[ ] that the evidence at trial established guilt beyond a reasonable doubt. Rather, the pertinent question is whether any rational trier of fact could have found the essential elements after viewing the evidence in the light most favorable to the State." *Roth*, 131 Wn. App. at 561. If there is substantial evidence, the weight of which reasonable minds may differ, it is the responsibility of the jury what weight the evidence ought to be given. *Id*. The jury is tasked with assessing the credibility of the witnesses and resolving disputed questions of fact. *Id*. Deference is, therefore, given to the jury on such issues. *Id*.

While a determination of the sufficiency of the evidence depends on the facts of each case, "a mere scintilla of evidence will not rise to the level of sufficiency in order to support a conviction." *State v. Fateley*, 18 Wn. App. 99, 102, 566 P.2d 959 (1977). In order to find that the evidence at trial was sufficient "there must be substantial evidence." *Id.* "Substantial evidence is evidence that is sufficient to persuade a fair-minded person of the truth or correctness of the matter." *ZDI Gaming, Inc. v. Wash. State Gambling Comm'n*, 151 Wn. App. 788, 807, 214 P.3d 938 (2009). When considering the evidence "we consider circumstantial evidence as reliable as direct evidence." *State v. A.T.P.-R.*, 132 Wn. App. 181, 184, 130 P.3d 877 (2006).

Under RCW 9A.44.083(1), a person is guilty of child molestation in the first degree when that person "has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is less than twelve years old and the perpetrator is at least thirty-six months older than the victim." As discussed above, the only element of the crime of first degree child molestation Mr. Hernandez contested was whether his touching of M.L. constituted sexual contact.

Sexual contact is defined as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(13). "Sexual gratification" is not an essential element of first degree child molestation; rather, it clarifies the essential element of sexual contact. *State v.*

*Lorenz*, 152 Wn.2d 22, 34-35, 93 P.3d 133 (2004). Absent from the definition is inadvertent touching or contact.

In order to prove the essential element of sexual contact, "the State must establish the defendant acted with a purpose of sexual gratification." *Stevens*, 158 Wn.2d at 309. Therefore, sexual contact "continues to require a showing of purpose or intent." *French*, 157 Wn.2d at 611. "Thus, while sexual gratification is not an explicit element of . . . child molestation, the State must prove a defendant acted for the purpose of sexual gratification." *Stevens*, 158 Wn.2d at 309-10.

M.L. reported to Ms. Murtsig that Mr. Hernandez touched her vagina two or three times underneath her clothing while her grandmother was in her bedroom. Mr. Hernandez confessed to the detective that on one occasion his hand went into M.L.'s underwear and he touched her vagina for "[s]ome . . . three seconds." CP Supp. at 163 (second alteration in original). Albeit Mr. Hernandez claimed his touching of M.L.'s vagina was accidental, in an attempt to prove this element, the State produced evidence that Mr. Hernandez admitted touching M.L.'s vagina on more than one occasion and that he felt bad because he knew that it was wrong.

In viewing this evidence in a light most favorable to the State, a fair-minded person could be persuaded of the truth of the State's evidence. M.L.'s testimony, balanced against Mr. Hernandez's statements, create disputed facts for a jury's determination. The testimony elicited at trial, coupled with the circumstances

24

surrounding when, where, and how the touching occurred, could lead a rational trier of fact to find the essential element of sexual contact. Sufficient evidence supports the essential element of sexual contact.

CONCLUSION

Mr. Hernandez's trial counsel was deficient in failing to engage an independent, qualified interpreter to interpret the recording of Mr. Hernandez's interview. Substantial evidence supports the essential element of sexual contact. Consequently, double jeopardy does not preclude the State from retrying Mr. Hernandez.

We reverse Mr. Hernandez's conviction and remand for a new trial.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____    _____
Lawrence-Berrey, A.C.J.                Pennell, J.